Per Curiam:
This is a suit for the recovery of income taxes (plus interest and penalties) for the years 1950, 1951, 1952, 1954, 1955, and 1956, on the ground that the plaintiff is exempt from Federal income taxation under Section 501(c)(6) of the Internal Revenue Code of 1954 and the corresponding provision of the Internal Revenue Code of 1939 (Section 101 (7)). These sections of the Codes exempt:
Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.
On the basis of the Trial Commissioner’s subsidiary findings of fact, which in all essential aspects are accepted by both parties, we hold that the taxpayer fails to meet the requirement of the Codes and the implementing Treasury Regulations that it not engage in performing particular services for individual persons (Treas. Reg. 118, § 39.101 (7)-1 and Treas. Reg. on Income Tax (1954 Code), § 1.501(c) (6)-1). The “Fashion Shows” and “Market Weeks” held by the taxpayer in the taxable years were not merely incidental activities but constituted a very substantial function which was the organization’s principal and most important activity ; and this important activity was for the direct economic benefit of individuals rather than for the improvement of business conditions for the industry generally. See Evanston-North Shore Board of Realtors v. United States, 162 Ct. Cl. 682 (1963), 320 F. 2d 375, cert. denied, 376 U.S. 931 (1964); United States v. Oklahoma City Retailers Ass'n, 331 F. 2d 328 (C.A. 10, 1964); National Ass'n of Display Industries, Inc. v. United States, 64-1 USTC par. 9285 *149 (S.D.N.Y., 1964); Bev. Bui. 58-224, 1958-1 Cum. Bull. 242.* Plaintiff is not entitled to recover the income taxes and interest for the taxable years.
Defendant has conceded plaintiff’s right to a refund of the penalties assessed against and paid by plaintiff for 1950, 1951, and 1952. The amount of those penalties, plus interest, was $471.27. Plaintiff is entitled to recover this amount, together with interest thereon as provided by law, and judgment is entered to that effect.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and arguments of counsel, makes findings of fact as follows:
1. (a) Plaintiff is a non-stock corporation[1] organized June 15, 1950, under the laws of Florida.[2]
(b) It is the Florida affiliate of the National Association of Men’s and Boys’ Apparel Clubs.[3]
(c) Its membership is limited to salesmen selling men’s and boys’ apparel at wholesale in Florida.[4]
(d) Its purpose was defined in its charter as follows:
The general nature and object of this corporation shall be to foster the interests of its members; to bring about a closer relationship among all Men’s Apparel traveling salesmen, to cooperate with kindred organization in promoting the ethics and welfare of commercial traveling salesmen; to elevate and improve the moral and commercial standard of Men’s Apparel trav *150 eling salesmen, and to discredit the unjust and dishonorable; to promote better relations between Men’s Apparel traveling salesmen and retail merchants; and to promote better relations between manufacturers of Men’s Apparel and Men’s Apparel traveling salesmen.
2. (a) On March 20,1953, plaintiff filed with the District Director of Internal Eevenue[5] an Application for Exemption[6] from Federal income tax under section 101(7) of the Internal Eevenue Code of 1939.
(b) Following are excerpts from the questions and answers on the application form:
$ * $ * *
[Q] 4. State briefly the specific purposes for which the organization was formed. (Do not quote from, or make reference to, the articles of incorporation or bylaws for this purpose.)
[A] To foster closer relationships among salesmen, between the salesmen and retailers, and between the salesmen and manufacturers of men’s and boys’ apparel.
[Q] 5. State all sources from which income or receipts are derived.
[A] Initiation Fees, Membership Dues, Fashion Shows, Journal Advertising.
[Q] 6. Specify the purposes for which funds are expended.
[A] Presentation of Fashion Shows, Annual Year Book, National Association Dues.
[Q] 10. State all of the activities in which the organization has engaged during its last two years of active operation. (Explain in detail.)
[A] Presentation of Periodic Fashion Shows in various Florida locations.
Hi ❖ ❖ ❖ H*
(c) On July 21, 1953, in response to a request from the District Director, plaintiff submitted (1) a statement of assets and liabilities and net worth as of October 31, 1952, and (2) a statement of receipts and disbursements for the fiscal year ended October 31, 1952. The latter statement is set forth in Table 1, which is incorporated herein.
*151 Table 1
BEOEEPTS :
Initiation Fees_ $3, 765. 00
Membership Dues_ 4, 616. 00
Manufacturers Advertising_ 8, 690.44
Show Fees_ 14,496.45
Banquet Tickets_ 3, 595. 00
Dinner Affair_ 503. 08
Retail Lists_ 35. 00
$35, 700.97
DISBURSEMENTS :
Show Expenses:
.Stationery and Printing_ $5,257.67
Entertainment, Gift and Prizes_ 4, 904.11
Director, Signs, Publicity and Promotion— 1,943. 76
Hotel Rental_ 3, 551. 03
Rental — Tables, Racks, Chairs_ 1, 561. 06
Banquet_ 5,435.00
Fashion Show Expense _ 1, 063. 76
Insurance_ 125.25
Guard Sendee_ 150. 50
Miscellaneous_ 81.43
$24, 073.57
Operating Expenses:
Stationery, Printing & Postage_ $2,008.76
Executive Secretary’s Fee _ 1,886. 57
Publicity, Advertising, Gifts and Pins_ 1, 564. 65
Rent _ 195. 00
Telephone _ 134.18
National Association Dues _ 769. 00
National Convention_ 1,233.01
Auditing_ 100. 00
Subscriptions - 27.00
Executing Meeting Expenses_ 44.05
Dinner Affair_ 597. 00
General Expense_ 265. 94
$8, 825.16
32, 898. 73
ADDITION TO NET WORTH-For year ending October 31, 1952. $2, 802.24
(d) On January 19, 1954, in response to a request from the Exempt Organization Branch of the Internal Bevenue *152 Service for additional information,[7] plaintiff replied as follows:
!¡í * * * ' *
1. ar-MANUEACTURERS ADVERTISING $8,690.44
The Mens Apparel Club sponsors semi-annual fashion shows, at which time show books are printed and distributed freely to all members, guests, buyers, and merchants. The sample show book enclosed discloses the advertising as contracted for by the participating manufacturers being represented. (Sample Contract enclosed.)
b-snow eees $14,496.45
At each semi-annual show, participating members of the club are charged for the hotel rooms used as display areas for their respective lines. The club furnishes display tables and other various materials, and is responsible for the directories identifying the exact location of the salesmen.
C — PUBLICITY, ADVERTISING, ETC. $1,564.65
In order to promote the Fashion Show, letters are sent to all manufacturers, retailers, and buyers suggested by members. In addition, flyers, and other forms of publicity are used. Samples of such are enclosed.
2. Sample copies of general advertising are enclosed.
3. The Executive Directors of the Club determine the dates of the show to be held. Paid up members are sent contracts which must be signed and returned in order to reserve display areas. In addition, the represented manufacturers are sent Advertising Contracts which must be signed and returned in order to appear in the Show Book. (Sample Enclosed.) Invitations are distributed to various buyers, retailers, and other merchants. The show itself is designed to present the latest in men’s fashions with the end purpose of booking business. The show fees are in accord with the various mens apparel clubs of other areas.
4. We are enclosing various printed samples of the publicity, advertising, circulars, flyers and show books used at each semi-annual show by our group.
3. (a) On July 6,1954, the Internal Bevenue Service ruled that plaintiff was not a tax-exempt organization under section *153 101(7) of the Internal Revenue Code of 1939. The letter stated that—
On the basis of the evidence presented, it is concluded that you are organized and operated primarily to serve-the business needs of your members and that in conducting your fashion shows you are performing particular services for your members in that such shows serve themas a convenience and economy in the operation of their respective businesses. Accordingly, it is held that you do not meet the requirements of section 101 (7) of the Code and that you are not entitled to exemption under that section of law.
(b) On October 4, 1954, plaintiff filed with the Commissioner of Internal Revenue a protest of the July 6 ruling, stating that its “Fashion Shows” should have been termed “Market Weeks” and that they were but one phase of its overall program; and that because its activities were so broad, plaintiff had found it impossible to describe the full program in the protest.
(c) On January 31, 1958, the protest was denied and the. initial ruling of July 6,1954, was reaffirmed[8] as follows:
It is our position that in conducting the market weeks you are rendering services having an economic benefit for individual persons rather than engaging in activities directed to the improvement of business conditions for the industry generally. Accordingly, our ruling of July 6,1954, is affirmed.
(d) Action was filed in this court on July 22,1959.
4. (a) By this action plaintiff seeks to recover the income taxes, interest, and penalties [9] paid by it for the taxable years *154 ending on October 31,1950, to October 31,1956, inclusive.[10]
(b)In March 1957, plaintiff paid corporate income taxes and interest in the following amounts:

(c) In July 1957, plaintiff filed claims for refund for the amounts paid as taxes and interest, as set forth in the preceding paragraph, and as penalties, as set forth in footnote 9.[11]
(d) On May 21,1958, the District Director disallowed the claims for refund in their entirety.
(e) The claims (except as to the amount of the penalties) are now at issue before this court on the single question as to whether plaintiff, during the years involved, was entitled to exemption from Federal income tax as a business league under the provisions of section 501(c) (6) of the Internal Bevenua Code of 1954 (or its predecessor section 101 (7) of the Internal Bevenue Code of 1939).
5. (a) During the taxable years in question (1950 through 1956), plaintiff maintained an office in Miami. Its officers and directors were elected from its membership and served without salary.
(b) The office (including activities planned in and conducted from the office) was managed by an executive secretary, who was plaintiff’s only salaried employee. At the time of the trial of this action, in March 1963, the position of executive secretary was held by a former attorney, who had held the position and discharged its duties, on a part-time basis, since September 1950.
*155 (c) Under the active direction of the executive secretary (as authorized and supervised by the officers and directors of the corporation) and during the years after 1950 (last quarter) , plaintiff engaged in the following activities:
(1) The sponsoring of semiannual trade-shows or market weeks.
(2) The development and consideration, in conjunction with the national association, of a standard form of contract between apparel manufacturers and apparel salesmen.
(3) The conducting of polls and studies concerning the problems of apparel salesmen, apparel manufacturers, and apparel retailers.
(4) The providing of an adjustment service to resolve disputes between apparel salesmen and apparel manufacturers.
(5) The participation in the Dress Night Program sponsored by the Institute of Men’s and Boys’ Wear.
(6) The participation in a Father’s Day Program designed to stimulate retail sales of apparel items.
(7) The sponsoring of a blood bank for members and others.
(8) The conducting of efforts to secure preferential rates for apparel salesmen for such items as hotels and tires.
(d) The executive director estimated[12] that plaintiff’s time was divided, approximately, one-third for the trade-shows and two-thirds for the remaining activities.[13] His recollection, however, was not clear that all of the activities listed by him were part of plaintiff’s program in 1956 and prior years.[14]
6. (a) During the taxable years 1950 through 1956, plaintiff conducted semiannual trade-shows[15] in May and October, *156 [16] each one being held in an oceanfront hotel in Miami Beach. Retailers were admitted to the shows without .charge. The shows were not open to the general public.
(b) Sometime prior to a trade-show, a letter was sent by plaintiff to each of its members informing him of the date and location of the show and the entrance cost for members who desired to participate in the show as exhibitors.[17]
(c) Participation as exhibitors in the trade-show ran as high as 15 percent of plaintiff’s membership.
(d) Each participating member was assigned (1) space in a general display or exhibit room at the show hotel and (2) a room or rooms at the hotel for use in making a complete display of his line or lines of apparel. Tables and racks for the display were obtained from plaintiff.
(a) A show book was published for each show. Each book contained a message from the president of plaintiff, the program of the show, and a directory of salesmen, listing for each individual the line or lines of men’s wear represented and the room number of his display. It also contained a complete listing of plaintiff’s membership and of the advertisers who had purchased advertising space interspersed throughout the book.
(b) Advertisements comprised the bulk of each show book. They were placed and paid for by the various manufacturers of men’s and boys’ apparel.[18]
8. (a) Prior to each trade-show, plaintiff distributed to retailers promotional material to quicken their interest in attending. An example follows:
So very much to see and do! The nation’s top lines spread before you to provide you with a veritable gold mine of sales potential!
All in a holiday atmosphere at two of Miami Beach’s most luxurious hotels. Here’s your chance to combine business with pleasure. Make it a vacation that will pay off for you.
*157 Plan to do your buying at the M.A.C. International Sportswear and Cruisewear Premiere . . . and count on a gala program of top notch fun and entertainment.
(b) As a further inducement of attendance by retailers, prizes were awarded and entertainment furnished at the shows.
(c) A buyer’s guide or directory was mailed to all retailers in the area before each show and furnished at the show to each one in attendance. The guide listed each salesman participating in the show, the line or lines he represented, and the location of his display rooms.
(d) Set forth below is a typical October trade-show program.[19]
PROGRAM
SATURDAY, OCTOBER 10, 1953
Salesmen check in at Koom Clerk’s desk and receive from your mail box, your sample room key and the envelope containing your badge and instructions.
Salesmen must wear their exhibitors badges at all times during show. Please cooperate.
Late Afternoon — Gala Fashion Motorcade and Parade of Foreign Sports Cars celebrating the opening of the M.A.C. City — and Flag Raising ceremonies.
4:80 P.M. — Meeting of Board of Directors, Cavalier Room, Sans Souci.
7:30 P.M. — Annual Membership meeting, Cavalier Room, Sans Souci.
SUNDAY, OCTOBER 11, 1953
Official Opening of the International Sportswear and Cruisewear Premiere.
9:00 A.M. — Registration of Merchants and Buyers in main lobby of Sans Souci Hotel. Buyers must register and wear their badges, as admission to all displays and functions of show is by badge only. Please cooperate.
9:00 AM. — Opening of Hall of Fashion of lines displayed in each hotel, oef main lobby. Please understand lines on display at the Sans Souci will be on display in the Sans Souci Hall of Fashion and lines on display at the Sea Isle will be on display in the Sea Isle Hall of Fashion.
9:00 A.M. to 9:00 P.M. — Display rooms open.
*158 MONDAY, OCTOBER 12, 1953
9:00 A.M. — Begistration of Merchants and Buyers in main lobby of Sans Souci. Every one please cooperate and wear your badge.
9:00 A.M. — Opening of Hall of Fashion, opf Main lobby, in each hotel for lines on display at that hotel.
9:00 A.M. to 12:00 Noon — Display Booms Open. 12:00 to 1:30 P.M. — All display rooms closed during Trade Luncheon.
12:15 P.M. — Trade Luncheon in the Crystal Dining Boom, Sans Souci Hotel. Off The Becord Address by Marshal J. Mantler, Executive Director, Bureau of Salesmen’s National Associations.
1:30 P.M. to 9:00 P.M. — Display Booms reopened.
TUESDAY, OCTOBER 13, 1953
9:00 A.M. — Begistration of Merchants and Buyers in main lobby of Sans Souci. Every one please cooperate and wear your badge.
9:00 A.M. — Opening of Hall of Fashion, off main lobby, in each hotel for lines on display at that hotel.
9:00 A.M. to 7:00 P.M. — Display rooms open.
8:00 P.M. — Glamorous Style Show by Pool on the Cabana Terrace of the Sans Souci Hotel. Admission by badge only.
WEDNESDAY, OCTOBER 14, 1953
9:00 A.M. — Begistration of Merchants and Buyers in main lobby of Sans Souci. Every one please cooperate and wear your badge.
9:00 A.M. — Opening of Hall of Fashion, off main lobby, in each hotel for lines on display at that hotel.
9:00 A.M. to 9:00 P.M. — Display rooms open.
12:15 P.M. — Special Luncheon for the Ladies. Tickets available at MAC office.
THURSDAY, OCTOBER 15, 1953
9:00 A.M. — Begistration of Merchants and Buyers in main lobby of Sans Souci. Every one please cooperate and wear your badge.
9:00 A.M. — Opening of Hall of Fashion, off main lobby, in each hotel for lines on display at that hotel.
9:00 A.M. to 6:00 P.M. — Display rooms open.
6:00 P.M. — All display rooms closed.
7:00 P.M. — The grand banquet and dinner dance at Miami Beach Auditorium, climaxing a thrilling *159 week . . . with a star-studded array of Big Time Headline entertainers, please note: To avoid unnecessary confusion, your reservations have all been made by table numbers in advance. An information desk will be provided for your convenience at the entrance. Late inquiries and check up can be made there if necessary.
Dinner will be served at 7:30 P.M. No gratuities for dinner are necessary. They have been paid. Setups are available if desired.
Continuous music provided during dinner and for dancing later.
Admission by ticket only, priced at $6.50. Tickets may be obtained and reservations made in room No. 723, Sans Souci Hotel. No refunds will be made.
ERIDAY, OCTOBER 16, 1953
9:00 A.M. — Registration of Merchants and Buyers in main lobby of Sans Souci Hotel. Every one please cooperate and wear your badge.
9:00 A.M. — Opening of Hall of Fashion, ope main lobby, in each hotel for lines on display at that hotel.
9:00 A.M. to 9:00 P.M. — Display rooms open.
9:00 P.M. — Cocktail party.
9. (a) Retailers who attended the shows were under no obligation to place orders for merchandise. The shows afforded them opportunity to see many lines of merchandise, including lines stocked by their competitors, and to take notes for future study and reference when a salesman called at their stores. The shows were not designed to substitute for traveling and servicing customers at their places of business.
(b) On the other hand, members of plaintiff who participated in the shows were permitted to sell then and there to the retailers in attendance, for immediate or future delivery. Member-exhibitors took such orders and did much in addition to lay the groundwork for future sales. Only a small volume of a salesman’s annual sales were made at the shows.
(c) In addition to their selling functions, the trade-shows involved other activities, including exhibits, discussions, and clinics. Emphasis was directed to the small retailer, to help him expand his knowledge of clothiers, styles, and merchandising techniques.
*160 10. Plaintiff’s Federal income tax returns for the years 1950-1956 disclosed the following:

11. During the period 1950-1956, the single most important activity of plaintiff was the conducting of the semiannual trade-shows or market weeks, whether measured by the amount of time devoted to them or by the relative dollar amount of income and expense attributed to them.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that (1) as to penalties and interest assessed against and paid by the plaintiff for the years 1950, 1951, and 1952, in the amount of $471.27, the plaintiff is entitled to recover; and (2) as to income taxes and interest paid for the years 1950, 1951, 1952, 1954, 1955, and 1956, the plaintiff is not entitled to recover. It is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of $471.27, together with interest thereon as provided by law. Otherwise, the petition is dismissed. .

 Texas Mobile Home Ass’n v. Commissioner, 324 F. 2d 691 (C.A. 5, 1963), is distinguishable on its facts. For instance, the court there found that the annual mobile home show was in connection with the taxpayer’s undertaking to improve the deplorable conditions that existed in the house trailer industry in Texas.

 Members do not own shares, and have no right to dividends. No effort has ever been made to realize a profit from the corporation’s activities.

 Original incorporation was under the name of Men’s Apparel Club of Florida. The present name was adopted by a charter amendment approved and filed on December 30. 1958.

 Affiliates of the national association operate in various regions throughout the country. At the time of plaintiff’s incorporation, the nearest affiliate was in Atlanta. Many of the affiliates have been operating for a number of years prior to the time plaintiff was organized.

 During the years here pertinent (1950-1956), there were approximately 275 members. Each member was charged an initiation fee and annual dues. These charges were initially fixed in the organization’s constitution. Subsequently, the provision was altered to delete the stated sums and to make the fees and dues subject to determination by the board of directors.

 At Jacksonville, Florida.

 Form 1024, as revised Jan. 1950. The application was accompanied by Form 990 for fiscal periods June 1, 1950, to December 31, 1950; January 1, 1951, to November 30, 1951; and December 1, 1951, to October 31, 1952.

 The request was for a detailed explanation of items listed by plaintiff in its statement of receipts and disbursements (Table 1) as manufacturers advertising, show fees, and publicity, advertising, gifts and pins; for sample copies of plaintiff’s advertising; and for “[A] detailed description of your fashion shows and the manner in which fees charged for participation therein are determined.”

 This action was by the Acting Chief of the Exempt Organizations Branch of the Internal Revenue Service.

 Defendant states in its brief (p. 1) that “[t].he Government has conceded that there was no wilful neglect in the plaintiff’s failure to file returns for the years 1950, 1951, and 1952. Therefore, it is agreed that the penalties assessed for these years * * * be refunded.” The penalties, assessed under section 6651 of the Internal Revenue Code of 1954, for failure to file corporate income tax returns within the time prescribed, were paid on or about July 19, 1957, in the following amounts :

Taxable Tear

Sliding Penalties Interest Total

10-31-50_ $147. 52 $2. 48 $150. 00
10-31-51_ 287. 21 ■ 4. 83 292. 04
10-31-52- 28.81 .42 29.23
$471. 27

 Plaintiff’s books through October 31, 1957, were kept on the basis of a fiscal year ending October 31..

 Taxes, Interest, and penalties were In the total amount of $9,156.25.

 There is no challenge of the accuracy of this estimate.

 The breakdown of his estimates follows: dress right program, 12 percent; graduation day program, 3 percent; father’s day program, 5 percent; blood bank, 3 percent; entertainment, 2 percent; grievance committee, 1 percent; retailer relations, 5 percent; sunshine committee, 2 percent; employment service, 2 percent; FLAMBAC activities and services, 16 percent; and internal management, 15 percent. Total 66 percent.

 At least one activity (the graduation day program) was undertaken after 1956.

 Trade-shows were referred to as “Fashion Shows” in plaintiff’s exemption application and as “Market Weeks” in its protest.

 The October show was the more Important of the two.

 According to plaintiff’s bylaws, a member could not participate unless his dues were paid.

 Prior to each trade-show, plaintiff sent show book contracts to its members who in turn forwarded them to the manufacturing firms represented by them. Any such manufacturer who desired an advertisement in the book could purchase space at specified rates.

 This was the program for the trade-show of October 1953.