Whitaker, Senior Judge,
delivered the opinion of the court:
Plaintiff, Indiana Retail Hardware Association, Inc. (hereinafter referred to as the Association), brings this suit for the recovery of income taxes paid by it for the years 1954,1955 and 1956. It claims that during this period it was a “business league * * * not organized for profit and no part of the net earnings of which inure [d] to the benefit of any private shareholder or individual,” within the meaning of section 501 (c) (6) of the Internal Revenue Code of 1954[1] and as such it was exempt from taxation by section 501(a) [2] thereof.
*290 Treasury Regulation § 1.501(c) (6)-l defines a business league as follows:
A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one, or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. * * *
This regulation was first promulgated in 1929 and has remained substantially unchanged through repeated reenactments of the revenue laws,[3] all of which contained a section or sections exempting business leagues from taxation.[4] In none of these revenue acts has Congress indicated any dissatisfaction with the definition of a business league contained in the regulation. In addition, numerous court decisions have upheld its validity as a correct interpretation of the legislative intent. See Evanston-North Shore Board of Realtors v. United States, 162 Ct. Cl. 682, 320 F. 2d 375 (1963), cert. denied, 376 U.S. 931 (1964); United States v. Oklahoma City Retailers Ass'n, 331 F. 2d 328 (10th Cir. 1964); Automotive Electric Ass'n v. Commissioner, 168 F. 2d 366 (6th Cir. 1948) ; Apartment Operations Ass'n v. Commissioner, 136 F. 2d 435 (9th Cir. 1943) ; Underwriters’ Laboratories v. Commissioner, 135 F. 2d 371 (7th Cir.), cert. denied, 320 U.S. 756 (1943). Under these circumstances the regulation must be treated as having the force and effect of law.
*291 Thus, in order to qualify under the statute and regulation as a tax exempt business league, an organization must meet the following conditions: (1) It must not be organized for profit; (2) no part of its net earnings may inure to the benefit of any private shareholder or individual; (3) it must be an association of persons, incorporated or unincorporated, having a common business interest; (4) its purpose must be to promote that common business interest and not to engage in a business of a kind ordinarily carried on for profit; and (5) its activities must be directed to the improvement of conditions in the common business, as distinguished from performing particular services for individuals. All of these conditions must be met for the tax exemption to be applicable.
Since the decision in these cases depends upon the facts in each, we set out below the facts presented in this case.
The Association is an Indiana non-profit corporation which was organized in 1913 [5] and has continued in existence without interruption since that date. During the years in question it was the only trade association representing hardware retailers in the State of Indiana, with a membership of approximately 80 percent of the hardware retailers in the State, excluding hardware sections of department stores.
According to its Articles of Association, the objectives of the Association were “To promote and secure the mutual benefit, improvement, protection and cooperation of the retail hardware trade.” Its constitution and by-laws stated these objectives in more detail but were consistent with the Articles of Association.
As a part of its operation during the years 1954 through 1956, the Association engaged in both income and non-income-producing activities. Its non-income-producing activities included the following: the holding each year of annual Hardware Management and Hardware Sales Conferences ; the conducting of approximately 25 Display Clinics; the holding of an annual two- or three-day school on accounting and bookkeeping; the conducting of annual *292 group meetings in each of its 15 membership districts in Indiana; the publication and distribution to members without charge of a monthly magazine, the “Hoosier Hardware News”; the response to inquiries from members concerning modernization, management, and operational problems; the carrying on of legislative activities on behalf of members, including attempts to secure the passage or defeat of various bills in the Indiana Legislature; the holding each year of an annual convention of its members; and the conduct of other similar activities. These activities were in keeping with the Association’s objectives as stated in its Articles of Association.
If these had been the only activities in which the Association engaged, it would have satisfied all of the conditions required for exemption under the statute and regulation. However, as was mentioned above, the Association also engaged in income-producing activities. These activities included the sale to such of its members as wished to buy them of display fixtures and of various advertising promotional aids, such as calendars, wrapping paper, stickers and supplies, etc. The Association bought these things at wholesale prices and sold them at retail prices. It also supplied to such of its members as wished to pay for them managerial services, weekly bookkeeping, quarterly audits, yearly preparation of Federal income tax returns, and other similar services. It billed and collected premiums and distributed claim forms for underwriters who offered to the Association’s members and their employees group health, accident and life insurance. For the performance of these functions it received a percentage of the premiums collected.
In addition to the foregoing income-producing activities, the Association conducted an annual hardware show at the same time as the annual convention of its members. This show was attended by some of the members and by certain invited nonmembers. At the show various wholesalers and manufacturers would exhibit, demonstrate, and take orders for their wares. These exhibitors rented their display areas from the Association, which had initially rented a building for the purpose of the convention and show. From this *293 rental of exhibit space the Association derived substantial profit.
In connection with, the convention and hardware show and just prior thereto each year, the Association published the “Hoosier Hardware Guide” which, in addition to containing a program for the convention, messages from the Association’s president and secretary, and articles of information which members could utilize in the operation of their business, contained also a program for the show, a listing of the exhibitors at the show and their exhibit booth numbers, and advertisements for the goods and services which the Association sold. It also contained advertisements by exhibitors at the show and various other business concerns connected with the retail hardware trade. These advertisements, which constituted the major portion of the Guide, had been solicited by the Association and were a source of considerable income for it.
On May 26, 1953, the Commissioner of Internal Revenue finally held that plaintiff was not entitled to exemption. He said in conclusion:
Based upon a careful review of the evidence furnished, it is our opinion that one of your primary purposes as demonstrated by your operations is to engage in the sale of supplies and equipment to your members and that your activities in connection therewith constitute the performance of particular services for individual members as a convenience or economy hi their business, rather than the improvement of business conditions ox retail hardware merchants as a whole. Furthermore, you are engaged in activities which are ordinarily carried on for profit, and the fact that such activities may not result in a profit, or produce only sufficient income to be self-sustaining, is not controlling. Therefore, it is held that you are not entitled to exemption under the provisions of section 501 (c) (6) of the 1954 Code for 1954 and subsequent years. Accordingly, you are required to file income tax returns on Form 1120 for 1954 and subsequent years.[6]
Plaintiff does not deny that services for individuals occupied about half its time, but it says that services rendered individual members promoted the common interest of all and, *294 hence, should not impair its exempt status. How the members as a whole profited from bookkeeping services, for example, rendered an individual member, we do not see. As we said in Evanston-North Shore Board of Realtors v. United States, supra, at 688, 320 F. 2d at 379: “When each member contributes in proportion to what he receives, it is a strong indication that the benefits received are not * * * ‘inherently group benefits.’ ”
Nor was the trade show, which the Association held each year with its annual convention, and the “Hoosier Hardware Guide” which it published in connection therewith, from which it derived substantial profit, for the common benefit of the members. It was, for all relevant purposes, indistinguishable from the “Fashion Shows” or “Market Weeks” which we held in Men's and Boys' Apparel Club of Florida v. United States, 168 Ct. Cl. 147, 148 (1964), were “* * * for the direct economic benefit of individuals rather than for the improvement of business conditions for the industry generally.”
This, however, does not end our inquiry. An organization which by its principal purpose and activity is entitled to exempt status does not lose that status by engaging in incidental activities which, standing alone, would deprive it of the exemption. Evanston-North Shore Board of Realtors v. United States, supra, at 691, 320 F. 2d at 380. It thus becomes our task to determine whether the income-producing activities in which the Association engaged were merely incidental or whether they were sufficiently substantial to deprive it of an exempt status.
We have set out in finding 13, infra, for the years 1954 and 1955 the income[7] derived by the Association from each of its various activities and the percentage of its total income from each of these activities. It will be noted that for the year 1954 the income derived from activities not for the common benefit of all amounted to 58.54 percent of the Association’s total income, while the income from membership fees and interest amounted to only 41.46 percent. For the year 1955 the income from such activities constituted 59.81 per *295 cent of the total income as against 40.19 percent for membership fees and interest.[8]
We think the fact that such a large percentage of the Association’s income was derived from activities for the benefit of individuals is a strong indication that these activities were more than merely incidental. Cf. Scripture Press Foundation v. United States, 152 Ct. Cl. 463, 285 F. 2d 800 (1961), cert. denied, 368 U.S. 985 (1962).
The only other evidence in the record relevant to this question is the time devoted to these activities by plaintiff’s employees as compared with that spent on activities for the common benefit. Plaintiff’s managing director testified that he would estimate that roughly about 50 percent of the time of employees of the Association was devoted to its income-producing activities rather than to activities for the improvement of conditions in the retail hardware business as a whole.
We hold that the high percentage of income obtained by the Association from performing particular services for individuals as a convenience and economy in their business and its other income-producing activities, and the amount of time devoted by employees of the Association to the performance of these services is sufficiently substantial so that the income-producing activities cannot be said to be merely incidental activities of the Association, but are one of its two main purposes. Evanston-North Shore Board of Realtors v. United States, supra, at 694, 320 F. 2d at 382. We are of opinion that Congress did not mean to grant exemption from the payment of taxes to an association engaged to such a large extent in activities ordinarily carried on for profit by persons liable for the payment of taxes on the income derived from such activities.[9]
*296 The Association is not entitled to recover the income taxes paid for the years 1954, 1955 and 1956. The defendant has conceded the Association’s right to a refund of the penalties assessed against and paid by it. The amount of the penalties was $1,262.56. The Association is entitled to recover that amount, together with interest thereon as provided by law. Judgment is entered to that effect.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
L Plaintiff’s predecessor, Southern Indiana Retail Hardware Dealers Association, was organized in 1899 as a nonprofit association. Plaintiff, Indiana Retail Hardware Association, was incorporated in Indiana May 5,1913, pursuant to the provisions of an act entitled “An Act for the Incorporation of Societies Not for Pecuniary Profit,” etc., approved March 6, 1889, and published on page 144 of the Acts of the General Assembly for that year and acts amendatory thereof and supplementary thereto. It has continued in existence without interruption since May 5, 1913. Its office and place of business are now located at 4120 North Keystone, Indianapolis, Marion County, Indiana; during the years 1954 to 1956 it was located at 964 North Pennsylvania, Indianapolis, Indiana.
2. The objects of plaintiff organization as stated in Article II of its Constitution and By-Laws, in effect during the years 1954 through 1956, are:
The object of this Association is to encourage more careful study of the merchant’s economic function and educate its members to higher business standards; to search out and secure and [sic] adoption of such better business methods as will results [sic] in most economical distribution of merchandise; to encourage uniformity of trade practices and the reform of commercial evils, and to promote and maintain such friendly cooperation among retail hardware merchants in the State of Indiana as will advance their mutual interests and extend their usefulness by more efficient service to the public.
*297 The second provision of the Articles of the Association states: “The objects of the Association are as follows: To promote and secure the mutual benefit, improvement, protection and cooperation of the retail hardware trade.”
3. Articles III and IV of plaintiff’s Constitution and ByLaws, in effect during the years 1954 through 1956, include the following membership provisions:
ARTICLE III
MEMBERSHIP
Section 1. Any person, firm or corporation having an established place of business and engaged in the retailing of hardware, stoves, housewares, sporting goods, furnaces, plumbing supplies, implements and such other goods, including specialty lines, as are usually sold by retail hardware stores, shall be eligible to membership in this Association.
Section 2. Other retail institutions operating retail hardware departments sufficiently complete to serve hardware needs of their respective communities may, on approval of the Board of Directors, be eligible to membership, upon payment of the annual membership dues. * * * * *
Section 6. Any person, firm or corporation having an established place of business (or any person traveling as a representative of such person, firm or corporation) and engaged in the manufacture or distribution (at wholesale level) of hardware, stoves, housewares, sporting goods, furnaces, plumbing supplies, implement's and such other goods, including specialty lines, as are usually sold by retail hardware stores, shall be eligible to associate and associated membership in this Association, effective January 1, 1954.
ARTICLE IV
MEMBERSHIP OBLIGATIONS
The Association is a cooperative business enterprise of, and for hardware retailers who join for the general betterment of the business in which they are engaged, and the promotion of their individual and group interests. Every member should, therefore, actively participate in the affairs of the organization for the advancement of efficiency in hardware retailing and in hardware distribution. [Every associate member should cooperate fully *298 with the members of the organization for the advancement of efficiency in hardware retailing and in hardware distribution. However, an associate member is not entitled to vote or to hold office in the Association.] [1]
4. During the taxable years 1951 to 1956, inclusive, approximately 80 percent of the hardware retailers in Indiana, excluding hardware sections of department stores, belonged to the plaintiff association. It was the only trade association representing hardware retailers in the State of Indiana.
As a general rule, in determining whether a retail store operating a hardware department could be admitted to membership under article III, section 2 of plaintiff’s Constitution and By-Laws, plaintiff required that 25 percent of an applicant’s total sales volume come from items ordinarily sold in a hardware store.
5. Article IX of plaintiff’s Constitution and By-Laws provide the sources from which plaintiff may generate revenue:
ARTICLE IX
ASSOCIATION FINANCES
Section 1. The Association shall be financed by revenue received from the annual membership dues, which are payable on the first day of January each year, and the income from special services and other revenue producing activities in which it may be deemed wise to engage.
The annual membership dues shall be based upon the annual sales volume of each individual member store as follows:
No. 1 — Stores with sales volume under $25,000, annual dues $12.00
No. 2— “ . “ $25,000 to $50,000 annual dues $18.00
No. 3— “ “ “ “ “ $50,000 to $75,000 “ “ $24.00
No. 4— “ “ “ “ “ $75,000 to $100,000 “ “ $30,00
No. 5— “ “ “ “ “ $100,000and over “ “ $36.00[2]
Multiple or Branch Stores. — The parent store to pay dues on the basis of the total sales volume of all the stores owned and operated by same ownership, plus $10.00 for each branch.
Section 2. There may also be classified membership where specialized service is rendered continuously to *299 members in return for a fee fixed by the Board of Directors as commensurate with the service rendered.
Section 3. Associated Members. — Annual dues of associated members, as that term is defined in Article III, Section 6, shall be $25.00; provided that any traveling agent of such associated member may become an associate member, in which event his annual dues shall be $7.50.
$ ‡ $
6. Plaintiff association has never issued nor authorized the issuance of any capital stock.
7. Plaintiff, as part of its operation during the years 1954 to 1956, inclusive, was engaged in the following activities which were performed by plaintiff in a maimer similar to a business ordinarily carried on for profit:
(a) Plaintiff sold display fixtures to its members for use in exhibiting merchandise offered for sale in members’ stores. The fixture price included layout drawings, blueprints, installation and arrangement of the merchandise.
Display fixtures and related services similar to those sold by plaintiff were offered for sale to plaintiff’s members, during the years 1954 to 1956, inclusive, by organizations actively engaged in a business for profit.
(b) Plaintiff offered to its members the opportunity to subscribe to a management service which included weekly bookkeeping, quarterly audits, yearly preparation of federal income tax returns, and quarterly and annual checks of State Gross Income Tax returns. Balance sheets and profit and loss statements, also prepared by the plaintiff as part of this service, were compared with the financial statements of similar size hardware retailers located in Indiana and throughout the United States; reports stating the results of the comparison and ways the retailer could improve his operation were sent to the subscribing member. Plaintiff charged a fee for those services.
Similar services to those described above were available to plaintiff’s members from public accounting firms. However, no other organization or individual dealt specifically and exclusively with problems confronting these retail hardware dealers; plaintiff’s specialization would benefit the subscribing members.
*300 (c) Plaintiff sold various accounting and office supplies to its members. These included ledger cards, register forms, metal filing trays, loose-leaf ledger sheets and binders, and business stationery and envelopes.
Accounting and office supplies, similar to those sold by plaintiff, were offered for sale by private businessmen engaged in a regular business carried on for profit.
(d) Plaintiff sold various types of advertising aids to its members. These included calendars, balloons, yardsticks, books of matches and paint-mixing paddles which, imprinted with the name and address of the member’s store and the Association’s insignia, would be distributed by the members to their customers. Plaintiff also sold wrapping supplies (wrapping paper, paper bags, sealing tape and ribbon), price tags, labels and stapling machines.
Advertising aids, imprinted or plain, similar to those sold by the plaintiff were offered for sale by private businessmen engaged in a regular business carried on for profit.
(e) During the years 1954 through 1956, plaintiff offered its members and their employees group health and accident insurance coverage. Plaintiff performed, for the underwriters, administrative functions such as billing, collecting premiums, and distributing claim forms. These were the same functions that would be performed by an independent insurance broker. As compensation, the underwriting insurance company allowed plaintiff to retain, as a commission, a percentage of the premiums it collected. An independent insurance broker would have received approximately the same amounts for performing these functions.
(f) During the years 1954 and 1955, plaintiff was paid commissions by a private advertising agency and a private bad-debt collection service, as a result of individual member’s utilization of these services. Plaintiff suggested to its members that they avail themselves of these services.
8. Plaintiff purchased the display fixtures, accounting supplies, advertising aids and wrapping supplies at a wholesale price and, in turn, sold them to its members at the manufacturer’s suggested higher retail price.
*301 9. During the years 1954 through 1956, plaintiff engaged in the following activities in order to promote the common business interest of its members, namely the successful operation of retail hardware stores:
(a)Each year plaintiff held what was called a “Hardware Management Conference.” At the 1956 conference the following subjects were covered:
Profit and Loss Statements
Credit Programs Human Relations Budget Plan Shopping Centers
Programing Your Investments
Pricing for Profit Liability Insurance Estate Planning Quick Service
(b) Plaintiff conducted approximately 25 Display Clinics during the years 1954 — 1956. They were held for the membership of the Association and included discussions concerning improving merchandising and window displays.
(c) Plaintiff conducted an annual accounting and bookkeeping school lasting 2 or 3 days in each of the years 1954 through 1956, for member hardware store owners and their staffs. Individuals who were well qualified in the areas of bookkeeping, planning, accounting and tax reporting were invited to lecture to those in attendance.
(d) Plaintiff conducted annual group meetings for its members in each of 15 geographic membership-districts in Indiana. They were held for store owners and employees and covered subjects dealing with selling, advertising and legislative problems.
(e) During the years 1954 through 1956, plaintiff held an annual “Hardware Sales Conference” for its members. Its purpose was to help the members improve their selling technique. The 1956 conference lasted 2 days and the following subjects concerning Selling Techniques were covered:
(1) The Approach, (2) Closing the Sale, (3) What the Customer Expects and (4) Product Knowledge.
(f) Plaintiff published a monthly magazine called the “Hoosier Hardware News” and distributed it, without *302 charge, to its members. Attached to, and contained within the publication were advertisements for the products and services sold by the plaintiff, but it did not contain any other advertisements. It also included articles designed to keep plaintiff’s members informed of useful current information.
(g) During each year of the period involved here plaintiff responded to many telephonic and written inquiries from its members concerning store modernization, management, or other operational problems. The association also attempted to call on every member’s store once a year in order to discuss these problems.
(h) Plaintiff engaged in many legislative activities on behalf of its members including attempts to secure the passage or defeat of various relevant bills in the Indiana legislature. Plaintiff kept its members informed of Indiana and Federal legislation relevant to the hardware business.
(i) Plaintiff’s members received a monthly magazine entitled “Hardware Retailer” and an annual “Buyer’s Guide” showing sources of supply for hardware and kindred items. Both are published by the National Retail Hardware Association, Inc. Bulletins and booklets of interest and benefit to all retailers, prepared by the National Retail Hardware Association, Inc., were distributed by plaintiff to its members.
10. Plaintiff conducted an annual hardware show to which members and specifically invited non-members were admitted. Various manufacturers, wholesalers, distributors, jobbers of hardware merchandise and a few insurance companies would exhibit and demonstrate their wares. These exhibitors rented their display areas or booths from the plaintiff, who had initially rented a three-story building (the hardware show occupying two floors) for purposes of the show and a convention.
Prior to the show, plaintiff wrote letters to various business concerns for the purpose of soliciting such companies to rent exhibition space. There was no requirement that one be a member of the Association in order to rent space from plaintiff at the show. Exhibitors could, and did, sell and take orders for their merchandise at the show, and plaintiff suggested to its members that they buy such merchandise.
*303 One of the major problems of hardware retailers is to keep informed of new hardware items which become available on the market. The hardware show is one of the methods used to keep the retailer informed.
11. In connection with the annual hardware show, plaintiff held an annual convention. The nature of the convention activities was both business and social. The following is a summarized program of the 57th annual convention held in 1956.
TUESDAY MORNING, JANUARY 24, 1956
All Industry people, will be guests of President and Mrs. Alice Rinker at the complimentary brunch, the opening event of the 57th Annual Convention.
10:00 A.M. — President’s Brunch, Egyptian Boom, Murat Temple: Invocation_Dr. Boy Conners Meridian Heights Presbyterian Church Indianapolis
Opening of the 57th An- Managing Director nual Hardware Industry W. J. Sheely Convention Introduction of President_Vice President Charles L. Couger C. H. & C. Hardware Bainbridge
“Let’s Loot Ahead in 1956”— President Thurman Binker Binker Hardware Anderson
“The Human Side of Selling Jennings Bandolph Hardware” Assistant to the President Capital Airlines
EXHIBIT HOUBS [3] — 1TUESDAY, JANUABY 24, 1956 — 12:00 P.M. to 9:00 P.M.
HABDWABE INDUSTBY SQUABE DANCE TUESDAY, JANUABY 24, 9:00 P.M.
EGYPTIAN BOOM — MUBAT TEMPLE COME AS YOU ABE — BELAX — HAVE FUN
*304 WEDNESDAY MORNING, JANUARY 25,1956
9:30 A.M. — Hardware Industry President Rinker Convention Session. Candidates Room Second Floor Murat Temple
Report of Nominating Committee — Election of Officers “$200.00 The Easy Way”-Bernice Alexander Hartford Hardware Hartford City
“Creative Merchandising”-Prof. Ed Williams Indiana University Bloomington
“Make It Go”-William Gillespie Sales Mgr. Payette R. Plumb, Inc. Philadelphia
EXHIBIT HOURS [4] — WEDNESDAY, JANUARY 25, 1956 — 12:00 to 6:00 P.M.
12:15 P.M. — 'Wednesday DISTRICT CHAIRMAN LUNCHEON: LADIES HARDWARE INDUSTRY LUNCHEON WEDNESDAY NOON, JANUARY 25, 12:15 P.M. EGYPTIAN ROOM — MURAT TEMPLE HARDWARE INDUSTRY FLOOR SHOW AND BANQUET WEDNESDAY EVENING, JAN. 25th 7:00 P.M.
EGYPTIAN ROOM MURAT TEMPLE
THURSDAY MORNING, JANUARY 26,1956
9:30 A.M. — Hardware Industry President Rinker Convention Session.
Awarding of Twenty-Five Year Certificates “Let’s Go”_William G. Mashaw National Retail Hardware Association Indianapolis
“Coffee”_Richard Mills American Fletcher National Bank Indianapolis
EXHIBIT HOURS [5] — THURSDAY, JANUARY 26, 1956—
11:30 A.M. to 5:00 P.M.
*305 12. In connection with, the annual hardware show and convention, plaintiff published a yearbook, the “Hoosier Hardware Guide,” which was distributed to members free of charge. It was published each year just before the convention and hardware show and contained the following: advertisements for which plaintiff was paid by the respective advertisers and from which plaintiff derived income, advertisements of the goods and services sold by the plaintiff, messages from the president and the secretary of the plaintiff, the program of the show and convention, a listing of exhibitors at the show and their booth numbers, a listing of the business concerns who had placed paid advertising in the yearbook and articles of informational and educational value which the members could utilize throughout the year in the operation of their hardware stores.
Prior to its publication, plaintiff wrote letters to various business concerns for the purpose of soliciting companies to place paid advertisements in the yearbook. As a result, the contents of the yearbook consisted mainly of advertisements rather than educational articles.
13. During the years 1954 and 1955, plaintiff had income from the following sources and in the amounts stated below:[6]

*306

*307 14. Plaintiff did not sell or make available any of its services or products, described in findings 7 and 9, to nonmembers of the Association.
15. Plaintiff’s income-producing activities, described in findings 7,10, and 12, occupied approximately 50 percent of the time of its employees.
16. By letter dated July 26, 1935, the Deputy Commissioner of Internal Bevenue informed plaintiff that it was exempt from the federal income tax under section 101 (7) of the Bevenue Act of 1934. On August 23, 1938, this exemption was affirmed under the Bevenue Act of 1936. By letter dated October 18, 1951, the Deputy Commissioner informed plaintiff that its exemption was revoked and plaintiff was required to file federal income tax returns for the year 1951 and subsequent years.
17. Plaintiff timely filed U.S. Corporation Income Tax Beturns (Form 1120) for each of the years 1951, 1952 and
1953, and paid the taxes shown thereon to be due. Thereafter, on May 11,1954, plaintiff filed timely claims for refund for all of those taxes, contending that it was exempt from the federal income tax. A settlement was reached as to plaintiff’s tax liability for the years 1951, 1952 and 1953, and pursuant thereto plaintiff received a refund of all taxes it had paid for those years. Subsequently, on December 30,
1954, plaintiff’s counsel herein wrote to the District Director at Indianapolis, Indiana, asking that a ruling be issued to the effect that plaintiff is a tax-exempt organization under section 501(c) (6) of the 1954 Code and taxable only on unrelated business taxable income under sections 511, 512 and 513 of the 1954 Code.
18. By letter dated January 26, 1955, plaintiff refused to agree to a 1-year extension of the statute of limitations for assessment of taxes for the year 1951. The letter stated, in part, as follows:
As you know, last May the Association filed claims for refund of income taxes paid for the calendar years 1951,1952 and 1953. Pursuant thereto, in August, 1954 . one of your agents made a very thorough examination of the operations and records of the Association. At the conclusion of the audit, your agent and I (on behalf of the Association) reached a compromise agreement as *308 to the tax liability of the Association for the three years in question. Following this give-and-take conference, your agent recommended that the claimed refunds be granted. His recommendations were approved and the refunds were made in December, 1954.
All of this happened long before the forthcoming (March 15, 1955) expiration of the statute of limitations on assessments for 1951; Naturally we all thought that everything was settled for the three years in question. Consequently, the present request for an extension of the statute comes as a surprise — the kind of surprise that is always damaging to taxpayer morale.
19. On March 29,1955, plaintiff filed a Form 990-T, U.S. Exempt Organization Business Income Tax Beturn, for the calendar year 1954, showing no income tax due. This particular form was used on the advice of plaintiff’s counsel.
20. On April 28,1955, the District Director at Indianapolis wrote plaintiff’s counsel as follows:
Beference is made to your letter of December 30,1954 and subsequent telephone conversations regarding the tax status of the above named corporation for the year 1954.
After careful review of the case it has been concluded the status of the corporation as an exempt organization is not free from doubt, but the determination for the years 1951, 1952 and 1953 as made by this office, should not be disturbed. However, this action should not be construed as granting the corporation an exempt status for 1954 and subsequent years.
If the corporation claims exemption status for years subsequent to 1953 it will be necessary to file an Exemption Application, Form 1024, accompanied by complete evidence covering its activities, such as profit and loss statements and balance sheets for the years involved. Determination will then be made on the basis of such evidence and without regard to the action taken for the years 1951,1952 and 1953.
21. On March 15, 1956, plaintiff filed a Form 990-T, U.S. Exempt Organization Business Income Tax Beturn, for the calendar year 1955, showing no income tax due. This particular form was used on the advice of plaintiff’s counsel.
22. On March 26, 1956, plaintiff filed an Exemption Application (Form 1024) with the District Director.
*309 23. On February 7, 1957, plaintiff’s Managing Director wrote the District Director as follows:
As you know, on May 11, 1954 this Association filed with your office claims for refund of all Federal income taxes paid by this Association for the calendar years 1951, 1952 and 1953. The claims were based upon our contention that the Association is exempt from tax under the provisions of the Internal Revenue Code. The claims were allowed, and the taxes were refunded to us in December, 1954.
Pursuant to your instructions, on March 26, 1956 we filed with your office an Exemption Application, Form 1024, claiming exemption for the calendar year 1954 and subsequent years. _ This application is still pending.
_ Although we did report our income to your office on Form 990-T for the calendar years 1954 and 1955, it appears that information returns are not required while an exemption application is pending. Rev. Rul. 51^-393, GB 195J¡,-2, p. 1%5. Accordingly, we are not planning to file any return for calendar 1956 until our exemption application has been acted upon.
In accordance with the directions contained in Revenue Ruling 54-393, it is requested that the time for filing returns for calendar 1954, 1955 and 1956 be extended until such time as the exempt status of this Association has been determined.
It is also requested that the time for paying any Federal income taxes which may be determined to be due the Federal Government for calendar 1954, 1955 and 1956 be extended for a like period of time.
24. By letter to the District Director dated February 12, 1958, plaintiff’s Managing Director requested an extension of time for plaintiff to file its 1957 tax return. The terms of this letter are almost identical with those of plaintiff’s letter of February 7, 1957. (Finding 23.) On March 25, 1958, the District Director informed plaintiff in regard to its requests for extensions of time as follows :
Reference is made to your letter of February 12,1958 requesting the time for filing an income tax return for the calendar year 1957 be extended until such time as the exempt status of the Association has been determined.
Revenue Ruling 54-393 referred to in your letter states, “The mere claim or contention by an organization that it is exempt from Federal income tax under *310 section 101 of such Code does not relieve that organization of filing Federal income tax returns and paying' tifie tax. The original due date for filing a return and paying tax may occur before an organization has received a ruling or determination letter from the Service granting exempt status. In such a case, in lieu of filing a return and paying the tax, the organization may request an extension of time for performing those acts. A request for an extension of time for filing an income tax return must be made in accordance with the provisions of Revenue Ruling 54-86,1.R.B. 1954 — 10,8.”
Section 6081 of the Internal Revenue Code states, “The Secretary or his delegate may grant a reasonable extension of time for filing any return, declaration statement or other document required by this title or by regulations. Except in the case of taxpayers who are abroad, no such extension shall be for more than six months.”
Therefore, an extension of time for filing income tax returns for the calendar years 1954-1955 and 1956 cannot be granted.
An extension of ninety days is hereby granted for filing a tax return for the calendar year 1957.
25. On May 19, 1958, plaintiff filed a U.S. Corporation Income Tax Return (Form 1120). for the calendar year 1956, showing no income tax due.
26. By letter dated May 26, 1958, the Office of the Commissioner of Internal Revenue informed plaintiff that its application for exemption was denied. This letter stated, in part, as follows:
$ $ $ $ * You filed income tax returns on Form 1120 for 1951, 1952 and 1953, together with a claim for refund for each of these years, and such claims were allowed by the District Director at Indianapolis. However, you were subsequently informed by the District Director that the action taken for the aforementioned years should not be construed as granting you an exempt status for 1954 and subsequent years. Therefore, this ruling pertains to your status for tax purposes for the years subsequent to 1953.
% ❖ # ❖ * Based upon a careful review of the evidence furnished, it is our opinion that one of your primary purposes as demonstrated by your operations is to engage in the sale of supplies and equipment to your members and that your activities in connection therewith constitute *311 the performance of particular services for individual members as a convenience or economy in their business, rather than the improvement of business conditions of retail hardware merchants as a whole. Furthermore, you are engaged in activities which are ordinarily carried on for profit, and the fact that such activities may not result in a profit, or produce only sufficient income to be self-sustaining, is not controlling. Therefore, it is held that you are not entitled to exemption under the provisions of section 501(c)(6) of the 1954 Code for 1954 and subsequent years. Accordingly, you are required to file income tax returns on Form 1120 for 1954 and subsequent years.
27. On December 19, 1958, the Secretary-Treasurer of plaintiff executed a Form 872, Consent Fixing Period of Limitation Upon Assessment of Income and Profits Tax, extending to June 30, 1959, the time within which income tax deficiencies might be assessed against plaintiff for its taxable year ended December 31, 1955. On or about May 28, 1959, the Managing Director of plaintiff executed a Form 872, extending to June 30, 1960, the time within which income tax deficiencies might be assessed against plaintiff for its taxable year ended December 31, 1955.
28. By letter dated February 16, 1959, the District Director issued a so-called 30-day letter to plaintiff, with audit report attached, informing plaintiff of proposed deficiencies in plaintiff’s tax liabilities for the years 1954,1955 and 1956. For each year the deficiencies included a 25% penalty assessed under section 6651 of the Internal Revenue Code of 1954 for plaintiff’s failure to file a tax “return.” Plaintiff was allowed a net operating loss carryback deduction (Form 1957) in the computation of its ultimate deficiency for 1955.
29. While in general, the tax return forms filed by plaintiff for 1954, 1955 and 1956 were blank, there was attached to each a statement of “Receipts, Costs and Expenses.” Subtraction of the total costs and expenses from the total receipts shown on each of these statements yields amounts of taxable income identical with those determined by the District Director in his letter of February 16,1959.
30. On August 19,1959, deficiencies in taxes, penalties and interest, in the same amount as those proposed in the District *312 Director’s letter of February 16, 1959, were assessed against plaintiff, as follows:

On September 8, 1959, plaintiff paid the above liabilities in full.
31. On September 28, 1959, plaintiff filed claims for refund (Forms 843) in the following amounts:

Year Amount

1954_$2,559.98
1955_ 420. 06
1956_ 3, 586. 90
Total_$6, 566. 92
On December 8, 1959, the District Director notified the plaintiff that the refunds claimed were disallowed.
32. On March 14, 1960, plaintiff timely filed its petition hi this court for recovery of the amount paid, $6,566.92, plus interest as required by law. No action concerning these claims for refund, other than as stated in the petition, has been presented to Congress, any department of the defendant, or any court, other than the petition filed hi this court.
Plaintiff is the sole owner of the claims presented in the petition, and has made no transfer or assignment of these claims.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that (1) as to income taxes paid for the years 1954,1955 and 1956, the plaintiff is not entitled to recover; and (2) as to penalties assessed against and paid by the plaintiff to defendant for the years 1954,1955 and 1956 in the amount of $1,262.56, the plaintiff is entitled to recover. It is therefore adjudged and ordered that plaintiff recover of and from the United States the smn of one thousand two hundred sixty-two dollars and fifty-six cents ($1,262.56), together with interest thereon as provided by law. Otherwise, the petition is dismissed.

 Section 501(e)(6) provides:
"List of exempt organizations. — The following organizations are referred to in subsection (a) :
* * * * •
“(6) Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.”

 Section 501(a) provides:
"Exemption from taxation. — An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503 or 504.”

 Treas. Reg. 74 (1929 ed.), Art. 528; Treas. Reg. 77 (Rev. Act of 1932), Art. 528; Treas. Reg. 86 (Rev. Act of 1934), Art. 101(7)-1; Treas. Reg. 101 (Rev. Act of 1938), Art. 101(7)-1; Treas. Reg. 103 (1939 Code), §19.101 (7) — 1; Treas. Reg. Ill (1939 Code), §29.101(7)-!; Treas. Reg. 118 (1939 Code), § 39.101 (7) — 1.

 Revenue Act of 1932, eh. 209, § 103(7), 47 Stat. 169 ; Revenue Act of 1934, ch. 277, § 101(7), 48 Stat. 680; Revenue Act of 1936, ch. 690, § 101(7), 49 Stat. 1648; Revenue Act of 1938, ch. 289, §101(7), 52 Stat. 447; Internal Revenue Code of 1939 § 101(7).

 Prior to its incorporation as the Indiana Retail Hardware Association, Inc., the Association had operated as a non-profit association, the Southern Indiana Retail Hardware Dealers Association, from 1899.

 Plaintiff’s right to exemption had not been questioned until 1951, and exemption was not denied until 1954, but we do not Enow what the facts were in those prior years.

 Income means income without allocation of indirect expenses.

 We are unable to determine from the record the exact percentage of total income derived from each type of activity for the year 1956. There is, however, evidence that the Association engaged in the same type of activities in 1956 as it did in 1954 and 1955 ; and that its ratio of total receipts to total direct allocable costs and expenses for 1956 was substantially the same as for 1954 and 19,55. From this we infer that its ratio of income from the performance of particular services to income from membership fees and interest was approximately the same in 1956 as it was in 1954 and 1955.

 The Association’s argument that the statute of limitations, imposed by section 6591(a) of the Internal Revenue Code of 1954, had run for the years 1954 and 1955 is without merit. See Automobile (Hub of Michigan v. Commissioner, 353 U.S. 180, 187 — 8 (1957). For 1955 plaintiff executed a waiver and for 1954 it has failed to show the “good faith” required by section 6501 (g) (1) of the 1954 Code.

 Bracketed language added by amendment effective January 27, 1955.

 In Nos. 2, 3, 4 and 5 the author probably did not intend the word “under” to be repeated.

 The record Indicates that “EXHIBIT HOURS” referred to the hours the hardware show was open.

 See footnote 3, ibid.

 See footnote 3, p. 15, supra.

 Figures for tie year 1956 have not been included because there is insufficient evidence in the record to determine the direct costs and expenses attributable to each type of activity in which the plaintiff engaged during that year. Total figures which are available, however, show that during 1956 plaintiff had total receipts of $1S2,330.39, total direct costs and expenses of $135,620.06, and receipts less direct costs and expenses of $46,710.33.