# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TUALATIN VALLEY BUILDERS
SUPPLY, INC.,
*Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee.*

No. 05-36173

D.C. No.
CV-04-01581-HA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
December 6, 2007—Portland, Oregon

Filed April 10, 2008

Before: Diarmuid F. O'Scannlain, Susan P. Graber, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Graber;
Special Concurrence by Judge O'Scannlain

## COUNSEL

Marc K. Sellers, Schwabe Williamson & Wyatt, P.C., Portland, Oregon, for the plaintiff-appellant.

David I. Pincus and Samuel A. Lambert, Tax Division, Department of Justice, Washington, D.C., for the defendant-appellee.

## OPINION

GRABER, Circuit Judge:

The main question before us is whether the Internal Revenue Service ("IRS") exceeded its statutory authority when it promulgated Revenue Procedure 2002-40.[1] We hold that the IRS acted within its authority. Because Plaintiff Tualatin Valley Builders Supply, Inc., failed to meet the Revenue Procedure's deadline for claiming the benefit of a temporary five-year net operating loss carryback, we affirm the district court's grant of summary judgment to the United States.

FACTUAL AND PROCEDURAL BACKGROUND

The material facts are not in dispute. Plaintiff is a dissolved Oregon corporation that has completed a Chapter 11 bankruptcy proceeding. Plaintiff's 2001 tax year ended on March 31, 2001. On its 2001 income tax return, timely filed in December 2001, Plaintiff claimed a net operating loss of about $5 million.[2]

---

[1]A Revenue Procedure is a "statement of procedure that affects the rights or duties of taxpayers or other members of the public under the Code and related statutes or information that, although not necessarily affecting the rights and duties of the public, should be a matter of public knowledge." Treas. Reg. (26 C.F.R.) § 601.601(d)(2)(i)(b). "Revenue Procedures usually reflect the contents of internal management documents, but, where appropriate, they are also published to announce practices and procedures for guidance of the public." *Id.* § 601.601(d)(2)(vi).

[2]A taxpayer's net operating loss for a given taxable year is the excess of deductions over gross income. Internal Revenue Code (26 U.S.C.) (I.R.C.) § 172(c). The Internal Revenue Code permits a taxpayer to carry-

On the same date that it filed its 2001 income tax return, Plaintiff filed for a "quick refund" for tax year 1999.[3] Plaintiff's 1999 quick refund application used a net operating loss carryback from 2001. When Plaintiff filed that application, its 2001 net operating loss could be carried back only two years. I.R.C. § 172(b)(1)(A) (2001).[4] The IRS allowed Plaintiff's tentative adjustment for 1999.

On March 9, 2002, a few months after Plaintiff filed its 2001 income tax return and application for a quick refund, Congress amended § 172 of the Internal Revenue Code to provide a five-year net operating loss carryback period for tax years ending in 2001 and 2002. Job Creation and Worker Assistance Act of 2002 ("JCWA Act"), Pub. L. No. 107-147, § 102(a), 116 Stat. 25-26, *codified at* I.R.C. § 172(b)(1)(H).[5] Congress also provided that a taxpayer could elect not to take advantage of the new five-year carryback provision. Such an election would be allowed "in such manner as may be prescribed by the Secretary [of the Treasury] and shall be made by the due date (including extensions of time) for filing the

---

back a net operating loss to prior tax years and carryforward a net operating loss to future tax years. *Id.* § 172(b)(1)(A). As a general rule, a carryback is limited to two years and a carryforward is limited to 20 years. *Id.* The total net operating loss carrybacks and carryforwards for a given tax year are allowed as a deduction against taxable income. *Id.* § 172(a). Simply stated, a taxpayer that has a net operating loss for a given tax year may use that loss to offset income in prior years, later years, or both.

[3]A "quick refund" refers to an application for tentative adjustment on IRS Form 1139, "Corporation Application for Tentative Refund," under Treas. Reg. § 1.6411-1(b)(1).

[4]Although I.R.C. § 172 has been amended since 2001, the text of the subparagraph that provides for the two-year carryback period remains unchanged. *Compare* I.R.C. § 172(b)(1)(A) (2001) *with* I.R.C. § 172 (b)(1)(A) (2007). Therefore, unless the context requires otherwise, we omit the year of the I.R.C. from our citations.

[5]In its briefing, the government aptly describes JCWA Act § 102 as "essentially a temporary statutory provision that applies to only two tax years."

taxpayer's return for the taxable year of the net operating loss." *Id.* § 102(b), *codified at* I.R.C. § 172(j). Once made, the election would be irrevocable. *Id.*

Because the JCWA Act amended the Internal Revenue Code in March 2002 but applied to tax years ending in 2001 and 2002, some taxpayers—like Plaintiff—already had established their tax positions for 2001 or 2002. In mid-2002, therefore, the IRS released Revenue Procedure 2002-40, which outlined procedures for implementing the five-year carryback period for those taxpayers. Rev. Proc. 2002-40, §§ 1, 4-7. Generally, taxpayers wishing to change their tax positions were required to do so on or before October 31, 2002. *Id.* § 7.03.

On January 7, 2003, more than two months after the deadline established by the Revenue Procedure, Plaintiff filed an amended 1996 corporate income tax return in which it carried back its 2001 net operating loss. On that amended return, Plaintiff claimed a refund of income taxes, with interest, after applying a five-year carryback of its 2001 net operating loss. The IRS disallowed Plaintiff's refund claim because Plaintiff already had elected to carryback the 2001 net operating loss to tax year 1999, and Plaintiff had failed to file a change of position by October 31, 2002, as required by Revenue Procedure 2002-40. Through its liquidation plan agent, Plaintiff then brought this action, pursuant to 28 U.S.C. § 1346(a)(1), seeking a refund for 1996.

On cross-motions for summary judgment, the district court denied Plaintiff's claim for a refund. The court held that the IRS validly set the October 31, 2002, deadline in Revenue Procedure 2002-40, explaining:

> The court construes this language [in I.R.C. § 172(j)]—"such election *shall be made in such manner as may be prescribed by the Secretary*" (emphasis provided)—as plainly bestowing upon the

IRS the explicit authority to determine how and when such elections can be made. The IRS did so by publishing Revenue Procedure 2002-40. The instructions prescribed by the Secretary establish the deadline of October 31, 2002, for electing to invoke the five-year carryback. Plaintiff failed to meet this deadline.

Plaintiff timely appealed.

## STANDARD OF REVIEW

We review de novo both a district court's grant of summary judgment and a district court's interpretation of the Internal Revenue Code. *Abelein v. United States*, 323 F.3d 1210, 1213 (9th Cir. 2003).

## DISCUSSION

On appeal, Plaintiff makes two arguments. First, it argues that Revenue Procedure 2002-40 was an impermissible exercise of the agency's authority and an incorrect interpretation of JCWA Act § 102. Second, Plaintiff contends that, even if Revenue Procedure 2002-40 is valid, Plaintiff timely filed a refund claim under § 6511(d)(2)(A) of the Internal Revenue Code.[6] As part of this second argument, Plaintiff contends that § 6511(d)(2)(B)(i), which mandates that a refund generally should be allowed even if otherwise prevented by operation or rule of law, trumps Revenue Procedure 2002-40 and its deadline of October 31, 2002.

In response, the government argues that Revenue Procedure 2002-40 is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837,

---

[6]Section 6511(d)(2)(A) allows a taxpayer to file a refund claim due to a net operating loss carryback within three years of the date when the return is due for the year generating the net operating loss.

843-44 (1984). The Revenue Procedure, it contends, was promulgated pursuant to an express delegation of authority; and, in any event, Congress later authorized and endorsed the Revenue Procedure, including its deadline, when it amended the five-year carryback rule as part of the Working Families Tax Relief Act of 2004, Pub. L. No. 108-311, § 403(b)(2), 118 Stat. 1166, 1187. The government also argues that § 6511(d)(2)(B)(i) serves the specific purpose of permitting a net operating loss carryback to a year closed by litigation, which is not the situation here.

A.   *Revenue Procedure 2002-40*

Statutory interpretation begins with the text of the enactment. *Duncan v. Walker*, 533 U.S. 167, 172 (2001). If "Congress has directly spoken to the precise question at issue[,] . . . that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842-43. If Congress has not spoken directly to the precise question at issue, we must decide how much weight to accord an agency's interpretation.

[1] The text of JCWA Act § 102 creates a five-year net operating loss carryback period for losses arising in tax year 2001 or 2002 and gives taxpayers an opportunity to elect out of that five-year period. The statute is silent, though, on how to treat taxpayers who already had elected a two-year net operating loss carryback. Both I.R.C. § 172(j) and a related Congressional Letter[7] gave authority to the IRS to promulgate

---

[7]Shortly after passage of the JCWA Act, and in response to a Treasury Department inquiry, the chairs and ranking members of the House Ways and Means Committee and the Senate Finance Committee sent a joint letter to the Treasury Department to "provide sufficient clarification so that the Treasury Department can issue guidance reflecting the Congressional intent of [the JCWA Act]." Congressional Letter from Rep. Bill Thomas, Chair, Comm. on Ways and Means; Sen. Max Baucus, Chair, Comm. on Finance; Rep. Charles B. Rangel, Ranking Member, Comm. on Ways and Means; Sen. Charles E. Grassley, Ranking Member, Comm. on Finance, to Mark A. Weinberger, Assistant Sec'y (Tax Policy), Dep't of the Treasury (Apr. 15, 2002).

implementing rules. *See* I.R.C. § 172(j) (providing that a taxpayer's "election shall be made in such manner as prescribed by the Secretary"); Congressional Letter (stating that "it is the intent of Congress that such revocation be made in such manner as prescribed by the Secretary" and "[w]e trust that this letter provides sufficient clarification so that guidance can be issued in a manner that fully reflects Congressional intent").

**[2]** Generally, when Congress has "explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," and "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44. The government contends that Revenue Procedure 2002-40 satisfies the requirements for, and is entitled to, *Chevron* deference. If the government is correct, then "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.

But not all agency determinations are accorded *Chevron* deference. "[A]gencies charged with applying a statute necessarily make all sorts of interpretive choices, and . . . not all of those choices bind judges to follow them." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). Even where not binding, those agency choices "certainly may influence courts facing questions the agencies have already answered." *Id.* In such an instance, "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances." *Id.* at 228. Generally referred to as *Skidmore* deference, the weight given to the agency's interpretation depends on "the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Id.* (footnotes omitted) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944)).

Our case law leaves unresolved the question whether a revenue procedure should receive *Chevron* or *Skidmore* deference. *Compare Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004, 1012 (9th Cir. 2002) (granting *Chevron* deference to an informal policy statement from the Department of Housing and Urban Development), *with Omohundro v. United States*, 300 F.3d 1065, 1068 (9th Cir. 2002) (per curiam) (applying *Skidmore* deference to an IRS revenue ruling).[8] We need not resolve the tension between *Schuetz* and *Omohundro* here. Even assuming that *Chevron* deference is not appropriate, under the less stringent *Skidmore* analysis, we hold that Revenue Procedure 2002-40 still should receive significant deference and that the Revenue Procedure is valid.

[3] *Skidmore* deference requires us to consider a variety of factors, such as the thoroughness and validity of the agency's reasoning, the consistency of the agency's interpretation, the formality of the agency's action, and all those factors that give it the power to persuade, if lacking the power to control. *Mead Corp.*, 533 U.S. at 228. Some *Skidmore* factors are difficult to assess with respect to Revenue Procedure 2002-40: There is no prior or later interpretive history to JCWA Act § 102 or Revenue Procedure 2002-40, and no analysis or reasoning accompanied the Revenue Procedure's procedural prescriptions. The balance of the *Skidmore* factors, however, reveal that Revenue Procedure 2002-40 is a persuasive interpretation of the law. The IRS—the authority on the interpretation and application of the Internal Revenue Code—promulgated Revenue Procedure 2002-40 under an express grant of congressional authority. The IRS did so only after

---

[8]A revenue ruling is "an official interpretation by the Service that has been published in the Internal Revenue Bulletin . . . for the information and guidance of taxpayers, Internal Revenue Service officials, and others concerned." Treas. Reg. § 601.601(d)(2)(i)(a). Revenue rulings "do not have the force and effect of Treasury Department Regulations . . . , but are published to provide precedents to be used in the disposition of other cases, and may be cited and relied upon for that purpose." *Id.* § 601.601(d)(2)(v)(d).

requesting further guidance from Congress concerning its intent. In addition, the amendments that Congress enacted after publication of Revenue Procedure 2002-40 were consistent with the procedures and deadlines established by the IRS. *See* Working Families Tax Relief Act § 403(b)(2) (enacting technical amendments to the JCWA Act). That sequence suggests that Congress implicitly ratified the Revenue Procedure as consistent with its intentions in passing the JCWA Act. *See, e.g.*, *Bob Jones Univ. v. United States*, 461 U.S. 574, 599-602 (1983) (analyzing congressional action to determine whether it implicitly ratified an IRS revenue ruling).

Plaintiff contends that neither § 172(j) nor the Congressional Letter directs the IRS to issue rules specifically related to a taxpayer in Plaintiff's position—that is, a taxpayer that filed an application for tentative adjustment under the two-year net operating loss carryback rule and now seeks to apply the five-year net operating loss carryback rule. Although that may be so, Congress has given the IRS broad authority to issue rules implementing the tax laws. I.R.C. § 7805(a) ("[T]he Secretary shall prescribe all needful rules and regulations for the enforcement of this title, including . . . as may be necessary by reason of any alteration of law in relation to internal revenue."). That broad authority supplements the specific grant of authority that Congress gave the IRS in JCWA Act § 102(b).

**[4]** Silence or ambiguity on a precise issue within the general ambit of a statute does not mean that courts accord no deference to an agency's interpretation of that statute. On the contrary, Congress' silence in this situation created an ambiguity for the IRS to resolve. In seeking to find a balance between the finality of income tax elections and a retroactive statute, the Revenue Procedure provides taxpayers a period of time, albeit a limited one, to make a new election to modify a prior one. Requiring taxpayers to decide by October 31, 2002, whether they would apply the five-year net operating loss carryback period was consistent with the text of the

JCWA Act and was implicitly ratified by Congress when it amended the Act in 2004.

## B.   *I.R.C. § 6511(d)(2)(B)(i)*

Plaintiff next argues that I.R.C. § 6511(d)(2)(B)(i) trumps Revenue Procedure 2002-40's reduction of the three-year period within which a taxpayer can file an amended return carrying back a net operating loss. Section 6511(d)(2)(B)(i) provides:

> If the allowance of a credit or refund of an over-payment of tax attributable to a net operating loss carryback . . . is otherwise prevented by the operation of any law or rule of law other than section 7122 (relating to compromises), such credit or refund may be allowed or made, if claim therefor is filed within the period provided in subparagraph (A) of this paragraph [providing a three-year period for the filing of an amended return].

The government contends that § 6511(d)(2)(B)(i) serves a far narrower purpose, namely, ensuring that a net operating loss carryback is available even if the carryback year was litigated and closed. In support, the government cites the legislative history of the precursor to § 6511(d)(2)(B)(i) from the Income Tax Code of 1939[9] and *Mar Monte Corp. v. United States*, 503 F.2d 254, 258 (9th Cir. 1974), in which we recog-

---

[9]A Report of the House Ways and Means Committee discussing § 322(g), the predecessor statute to § 6511(d)(2)(B)(i), stated:

> [U]nder the proposed subsection (g) of § 322 of the Code, even though the tax liability for a given taxable year, for example, has already been litigated before the Tax Court, credit or refund of an overpayment attributable to a carry-back may be allowed or made, if claim for credit or refund is filed within the period prescribed in section 322(b)(6) . . . .

H.R. Rep. No. 79-849 (1945), *reprinted in* 1945 C.B. 566, 587.

nized that § 6511(d)(2)(B)(i) reflected a congressional concern that a taxpayer otherwise might be foreclosed from carrying back a net operating loss to a tax year previously litigated.

**[5]** We need not decide whether § 6511(d)(2)(B)(i) takes precedence over Revenue Procedure 2002-40 because the two may be harmonized. Simply put, Revenue Procedure 2002-40 did not shorten the period for filing an amended return. Under I.R.C. § 6511, Plaintiff still could file an amended return any time within three years from the date its 2001 return was due, carrying back its net operating loss for *two* years; Plaintiff simply could not carryback its 2001 net operating loss for *five* years without having also complied with the notice requirements of Revenue Procedure 2002-04. Had Plaintiff given the IRS timely notice of an election to change its previously established tax position, it would have had three years to file a claim for 1996 by means of an amended return.

## CONCLUSION

**[6]** It is well established that "[w]hether and to what extent deductions shall be allowed depends upon legislative grace." *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Congress provided eligible taxpayers with a windfall when it enacted JCWA Act § 102, extending from two years to five years the period in which 2001 and 2002 net operating losses could be carried back and deducted. Congress did not act fast enough to preempt taxpayers such as Plaintiff from establishing contrary tax positions, so it authorized the IRS, both generally and specifically, to promulgate rules implementing the new five-year carryback period. The IRS did so in Revenue Procedure 2002-40, which established an October 31, 2002, deadline for taxpayers in Plaintiff's position. That deadline is consistent with the text of the statute and the authority Congress has conferred on the IRS. Moreover, Congress implicitly ratified Revenue Procedure 2002-40 when it amended JCWA Act § 102 while leaving untouched the Revenue Pro-

cedure and its prescriptions. Because Revenue Procedure 2002-40 does not prohibit a taxpayer from filing a claim for refund in the absence of compliance, the Revenue Procedure neither shortens the period for filing a claim for refund or credit under § 6511(d)(2)(A) nor conflicts with § 6511(d)(2)(B)(i).

**[7]** In sum, giving appropriate deference to Revenue Procedure 2002-40, we hold that Plaintiff was required to file either an application for tentative refund or an amended tax return on or before October 31, 2002, in order to carryback its 2001 net operating loss to its 1996 tax year. It did not do so. Accordingly, we agree with the district court that Plaintiff's refund claim for 1996 was untimely.

**AFFIRMED**.

---

O'SCANNLAIN, Circuit Judge, specially concurring:

I join the court in its conclusion that Revenue Procedure 2002-40 is a valid exercise of the Internal Revenue Service's authority. Yet as the majority notes, there is tension in our case law as to whether the level of deference prescribed in *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), should apply to the agency's action in this case. Thus, while I agree with the majority that Revenue Procedure 2002-40 withstands scrutiny under either standard, I write separately because I believe this tension, left unresolved, could lead our court down a path that is inconsistent with Supreme Court authority and with common sense. As I explain, I believe that in this case, *Chevron* deference must apply.

I

Prior to 2002, the Internal Revenue Code allowed taxpayers to carry back the net operating loss accrued in a particular tax

year by a maximum of two years. 26 U.S.C. § 172(b)(1)(A). In 2002, Congress enacted the Job Creation and Worker Assistance Act of 2002 ("JCWA Act"), Pub. L. No. 107-147, § 102(a), 116 Stat. 25-26, *codified at* 26 U.S.C. § 172(b)(1)(H), which temporarily extended the carryback period from two years to five years. *Id.* The new five-year carryback applied only to tax years ending in 2001 or 2002. In addition, the JCWA Act provided that taxpayers could opt out of the five-year carryback, stating that the taxpayer's "election shall be made in such manner as may be prescribed by the Secretary." 26 U.S.C. § 172(j). The Internal Revenue Service ("IRS") responded to this specific delegation of authority by promulgating Revenue Procedure 2002-40. Among other things, the Revenue Procedure required taxpayers wishing to opt out of the five-year carryback to make their election on or before October 31, 2002. In this appeal, we must decide whether the IRS exceeded its authority when it imposed this deadline.

II

As an initial matter, the JCWA Act states unequivocally that the Secretary shall prescribe the manner of elections. 26 U.S.C. § 172(j). Thus, because Congress has "directly spoken to the precise issue," *Chevron*, 467 U.S. at 842, I would look no further than the statute's text in ascertaining the scope of the rulemaking authority Congress intended to delegate to the IRS. Accordingly, I do not believe the Congressional Letter discussed by the majority is relevant to our analysis. *See* Maj. Op. at 3740-41 (citing Congressional Letter from Rep. Bill Thomas, Chair, Comm. on Ways and Means; Sen. Max Baucus, Chair, Comm. on Finance; Rep. Charles B. Rangel, Ranking Member, Comm. on Ways and Means; Sen. Charles E. Grassley, Ranking Member, Comm. on Finance, to Mark A. Weinberger, Assistant Sec'y (Tax Policy), Dep't of the Treasury (Apr. 15, 2002)). Although the Congressional Letter recites that Congress intended the Secretary to prescribe the manner of elections, such intent is made plain by § 172(j).

Where Congress unambiguously expresses its intent in the text of the statute, I believe it unnecessary to entertain correspondence signed by a handful of legislators to confirm that Congress meant what it said—a taxpayer's "election shall be made in such manner as may be prescribed by the Secretary." 26 U.S.C. § 172(j).

### III

But just what level of deference should Revenue Procedure 2002-40 receive? In *United States v. Mead Corp.*, 533 U.S. 218 (2001), the Supreme Court explained that an agency's implementation of a statute will receive *Chevron* deference where it appears that Congress delegated authority to the agency to "make rules carrying the force of law," and where "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 226-27. Agency action that does not meet this test is subjected to the less deferential analysis prescribed by *Skidmore*. *See Mead*, 533 U.S. at 234-35.

### A

In this case, the agency interpretation claiming deference is a revenue procedure. Revenue Procedure 2002-40 was published in the Internal Revenue Bulletin, which serves as "the authoritative instrument of the Commissioner for the announcement of official rulings, decisions, opinions, and procedures, and for the publication of Treasury decisions, . . . and other items pertaining to internal revenue matters." Treas. Reg. § 601.601(d)(1). Importantly, however, revenue procedures are not produced through formal notice-and-comment rulemaking or formal adjudication.

The majority points out that our case law is unclear as to whether a revenue procedure should receive *Chevron* or *Skidmore* deference. Maj. Op. at 3742 (citing *Omohundro v. United States*, 300 F.3d 1065 (9th Cir. 2002) (applying *Skid-*

*more* deference to an IRS revenue ruling) and *Schuetz v. Banc One Mortgage Corp.*, 292 F.3d 1004 (9th Cir. 2002) (applying *Chevron* deference to a Department of Housing and Urban Development policy statement)). The majority declines to resolve this tension, concluding instead that Revenue Procedure 2002-40 is valid even under the less deferential *Skidmore* analysis. Maj. Op. at 3742. I agree with the majority that our precedents are inconsistent, but I believe the majority presents a question we are not required to ask. *Mead* does not instruct us to decide whether revenue procedures, as a class, are subject to one level of deference or another. Instead, the Supreme Court requires us only to determine whether *this* Revenue Procedure is entitled to deference under *Skidmore* or under *Chevron*.

In *Mead*, the Court explained that the formality of a particular agency action is an important factor in determining whether it receives *Chevron* or *Skidmore* deference, but not a determinative one. The Court noted that "[i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure." *Mead*, 533 U.S. at 230. And, as a consequence, the "the overwhelming number of [the Court's] cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication." *Id.* (citations omitted). Still, the Court emphasized that "[d]elegation of such authority may be shown in a *variety of ways*, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Id.* at 227 (emphasis added); *see also Swallows Holding, Ltd. v. Comm'r*, 2008 WL 427649, *5 (3d. Cir. 2008) (citing *Mead* for the proposition that "[w]hen determining whether Congress intends a particular agency action to carry the force of law, our inquiry does not hinge solely on the type of agency action involved.").

Yet on this point, our own cases are in conflict. In *Schuetz*, we applied *Chevron* deference to a Department of Housing

and Urban Development ("HUD") Policy Statement, even though it was not the result of formal rulemaking or adjudication. 292 F.3d at 1012. In so doing, we directly quoted from the Supreme Court's decision in *Barnhart v. Walton*, 535 U.S. 212 (2002), that "the fact that the Agency previously reached its interpretation through means less formal than notice and comment rulemaking does not automatically deprive the interpretation of the judicial deference otherwise due." *Schuetz*, 292 F.3d at 1012 (quoting *Walton*, 535 U.S. at 221) (internal quotation marks omitted). But only a few months later in *Omohundro*, we applied *Skidmore* deference to an IRS revenue ruling which was not the product of formal rulemaking or adjudication, because we interpreted *Mead* as holding that "an administrative agency's interpretation of a statute contained in an informal rulemaking *must* be accorded the level of deference set forth in *Skidmore*." 300 F.3d at 1067-68 (citations omitted) (emphasis added).

Our statements in *Schuetz* and *Omohundro* are irreconcilable. Moreover, our statement in *Omohundro* flatly contradicts the Supreme Court's instructions in *Walton* and *Mead*. *See Walton*, 535 U.S. at 221; *Mead*, 533 U.S. at 230-31. Indeed, the Court has emphasized that "as significant as notice-and-comment is in pointing to *Chevron* authority, the want of that procedure . . . does not decide the case," for the Court has "sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded." *Mead*, 533 U.S. at 230-31 (citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57 (1995)).

I agree with the majority that Revenue Procedure 2002-40 would satisfy even *Skidmore* deference and, as such, I understand the majority's decision not to resolve the conflict between *Schuetz* and *Omohundro* in this case. Yet I am convinced that *Omohundro*'s statement that *all* informal rulemaking must receive *Skidmore* deference cannot be reconciled with the Supreme Court's holdings in *Walton* and *Mead*.

Accordingly, I hope this court might one day confront *Omohundro* and clarify that the formality of a particular agency action, standing alone, does not determine the level of deference it receives. This was the path we followed in *Schuetz* and, in my view, this is the path that should be followed here. Under such framework, I believe Revenue Procedure 2002-40 is one example of informal rulemaking which is still entitled to *Chevron* deference.

## B

When Congress has "explicitly left a gap" for an agency to fill, "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," and "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44. Congress has empowered the Secretary of the Treasury and, by his delegation, the IRS with the broad authority to "prescribe all needful rules and regulations" to enforce the Code, including "all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." 26 U.S.C. § 7805(a). Most revenue procedures are promulgated pursuant to this general delegation. Yet in § 172(j), Congress specifically delegated to the Secretary the authority to prescribe the manner of elections. Revenue Procedure 2002-40 is the product of that rulemaking authority. In my view, this specific delegation strongly indicates that the resulting IRS action would carry the force of law and, thus, receive *Chevron* deference. *See Mead*, 533 U.S. at 227-29.

A comparison with *Schuetz* is instructive. In that case, we cited several reasons for applying *Chevron* deference to the HUD Policy Statement even though it was not formal action. First, the statute at issue authorized HUD to prescribe rules and regulations and to interpret the statute. 292 F.3d at 1012 (citing 12 U.S.C. § 2617(a)). Second, the Policy Statement was published in the Federal Register. *Id.* Finally, we noted

that notice-and-comment rulemaking would have been inpracticable because Congress issued a Conference Report which directed HUD to issue a policy statement within 90 days to resolve an ambiguity in the statute. *Id.* at 1009, 1012.

The same considerations counsel in favor of *Chevron* deference here. First, Revenue Procedure 2002-40 is supported by the Secretary's broad rulemaking authority under § 7805(a) and his specific authority under § 172(j). Second, the IRS published Revenue Procedure 2002-40 in the Internal Revenue Bulletin. Finally, notice-and-comment would have been impracticable in this case because time was of the essence for the IRS to exercise its power delegated by § 172(j) to establish the manner of elections out of the five-year carryback. As the majority explains, Congress enacted the JCWA Act on March 9, 2002. The Act created a five-year net operating loss carryback for tax years ending in 2001 and 2002. 26 U.S.C. § 172(b)(1)(H). It further provided that taxpayers could elect to opt out of the new carryback, but left the manner of election to the Secretary. *Id.* § 172(j). Yet by the time the Act became law, many taxpayers had already filed their tax returns of the tax years 2001 and 2002. Maj. Op. at 3738. Such taxpayers were faced with an awkward problem—the Act allowed them to opt out of the carryback, but they had no way of doing so until the Secretary told them how. By April 2002, the ranking members of the House Ways and Means Committee and the Senate Finance Committee recognized the dilemma and sent a letter requesting that the Secretary "issue guidance under which taxpayers are given until November 1, 2002" to, among other things, make an election to opt out. Congressional Letter, *supra* at 3847-48. In light of these factors, the IRS's response in Revenue Procedure 2002-40 was entitled to *Chevron* deference.

*Omohundro* is distinguishable. In that case, we applied *Skidmore* deference to an IRS revenue ruling that interpreted 26 U.S.C. § 6511(a). 300 F.3d at 1067-68. While the revenue ruling was issued pursuant to the IRS's broad powers under

§ 7805(a), it was not the product of a specific delegation of rulemaking authority such as the one provided by § 172(j). In addition, there is no evidence that the revenue ruling in *Omohundro* was issued under a time constraint such as the one facing the IRS here. Thus, despite *Omohundro*'s strained interpretation of *Mead* and its inconsistency with our earlier interpretation in *Schuetz*, several facts that counsel in favor of *Chevron* deference here were not before the court in that case.

## IV

I concur in the result reached by the majority—Revenue Procedure 2002-40 was a valid and enforceable exercise of the IRS's authority. But while the majority declines to specify the necessary level of deference, I would apply *Chevron* deference to this particular agency action. The distinction between our positions is important because the Supreme Court has made clear that sometimes informal rulemaking may still lead to deference under *Chevron*. I believe this is such a case.