**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BLUETOOTH SIG INC.,
            *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,
            *Defendant-Appellee.*

No. 08-35312

D.C. No.
2:05-cv-1778-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
July 9, 2009—Seattle, Washington

Filed July 8, 2010

Before: Robert R. Beezer, Diarmuid F. O'Scannlain, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge O'Scannlain

9819

## COUNSEL

K. Lee Marshall, Bryan Cave LLP, Saint Louis, Missouri, argued the cause for plaintiff-appellant and filed the briefs. Mary Gassmann Reichert, Thomas C. Walsh, and B. Derek Rose, Bryan Cave LLP, Saint Louis, Missouri were on the briefs.

Bridget M. Rowan, Tax Division, Dep't of Justice, Washington, District of Columbia, argued the cause for the defendant-

appellee and filed the brief. Kenneth L. Greene, Tax Division, Dep't of Justice, Washington, District of Columbia was on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether an association which owns and markets a wireless networking protocol and trademark is entitled to exemption from federal income tax as a business league.

I

A

Bluetooth is a technological specification that allows for two-way wireless data transmission using radio frequencies between multiple electronic devices over short distances (typically less than thirty feet). In less technical (and hence less precise) jargon, it provides a language for electronic devices to talk to one another. Originally, it was primarily used to connect mobile phones and wireless headsets. It is now also used for wireless communication between a great variety of products, including personal computers, printers, digital cameras, keyboards, home audio equipment, and medical devices.

Ericsson Technology Licensing AB began to develop Bluetooth. It worked with a few other major manufacturers (Toshiba, IBM, Intel, and Nokia) in refining the Bluetooth technology in an association called Bluetooth Special Interest Group. Ericsson initially owned the Bluetooth name and patents. Subsequently, the technology companies caused the Special Interest Group to be incorporated as Bluetooth SIG ("SIG") on November 13, 2000 as a Delaware nonprofit cor-

poration to own the name and patents. Its stated purpose: "development and regulation of technical standards for the compatibility and interoperability of wireless products within a wireless personal network."

Ericsson sold all of its rights to the Bluetooth name and patents to SIG on February 20, 2001. According to the terms of the transfer, Ericsson was reimbursed for some of its legal expenses and received the right to "eighty percent (80%) of all Net e-Commerce Revenue . . . up to a maximum aggregate of all such payments of thirty million United States dollars" as consideration. The organizers of SIG had some interest — it is not clear how much — in running an online store at which consumers could buy Bluetooth-compatible devices. For whatever reason, this did not come about, and thus there was no "e-Commerce Revenue."

## B

SIG's operations fall into four major categories: specification development, marketing, trademark enforcement, and certification/licensing.[1]

First, SIG develops, refines, and adapts the Bluetooth specification. SIG acts as a forum through which different technology manufacturers collaborate in the development process. It

---

[1] We note that SIG's status after 2002 is not before us. SIG appears to seek a declaratory judgment that it is eligible for business league status. We lack jurisdiction over such a claim. *See* 28 U.S.C. § 2201 (barring jurisdiction over federal tax controversies). Although the Declaratory Judgment Act allows for suits to determine non-profit status, they are limited to organizations claiming exemption under § 501(c)(3), not § 501(c)(6). *See* I.R.C. § 7428. Furthermore, SIG's suit seeks relief for only the 2000-2002 tax years. However, because both parties freely discuss post-2002 evidence, and because the result does not hinge on consideration of such evidence, we will discuss it as well. We do not decide whether consideration of post-2002 evidence would be proper if objected to by one of the parties.

does this through meetings, conferences, working groups, and by sharing research results. As a result, the Bluetooth specification is constantly evolving.

Second, SIG engages in marketing, public relations, and other promotional activities designed to "influence the acceptance, understanding, and use of Bluetooth enabled products." It conducts market research, sponsors trade fairs, and publishes handouts and flyers for trade shows and other events. It also publishes newsletters for members in order to keep them informed of the organization's activities.

Third, SIG enforces its trademark both by ensuring that its members conform to the "Bluetooth Brand Book" and by detecting unauthorized use of the Bluetooth trademark. It employs trademark counsel to protect its mark both in the United States and around the globe. According to SIG's marketing manager, unauthorized users were encouraged to become part of SIG and have their products certified. It does not appear that any infringement suits have been filed. SIG works to have infringing products seized and destroyed if they pass through U.S. customs.

Fourth, SIG operates a certification and listing program. The organization does not directly provide product testing services to its members. Until 2006, a member desiring certification needed to submit its product to a Bluetooth Qualification Testing Facility. The results of the testing would, in turn, be submitted to a Bluetooth Qualification Board for review. The boards and testing facilities were independent entities, but had to be approved by SIG and pay an annual fee. The fees charged by the testing facilities varied and were unregulated by SIG. Once the product was certified by a board, its manufacturer could use the Bluetooth trademark on the product by paying a listing fee. The product would also be listed as Bluetooth-compliant on the SIG website. This process needed

to be repeated for each product that used the Bluetooth specification.[2]

C

As of October 2005, SIG had 4,148 members, all independent businesses. SIG has three membership classes: Adopters, Associates, and Promoters. Adopters pay no annual fee, but pay a listing fee of $10,000 per product.

Associates pay an annual fee of either $7,500 or $35,000 depending on the size of the manufacturer. They pay a reduced listing fee of $5,000 per product and have the right to participate in the continuing development of the Bluetooth specification. They receive certain marketing and promotional opportunities that may not be available to Adopters.[3]

Promoters pay no annual fee but enjoy the same benefits as Associates, plus a seat on the board of directors. Each of the original five companies involved with the technology has Promoter status. New applicants must be approved by the board of directors and pay a one-time fee in an amount set by the board. As of the date of the district court's ruling, only three additional members had been permitted to join the Promoter group.

D

Between its incorporation and the end of 2000, SIG realized $309,180 in income with $146,985 in expenses. At the

---

[2]Beginning in August of 2006, the third-party testing program became optional in most cases. Instead, manufacturers could declare their products compliant after conducting testing with a software program.

[3]For example, according to Lindsay Puett, marketing coordinator for SIG during 2003-2004, "if an opportunity comes along, we often try and go to them first with it." For instance, if members of the media asked SIG for product recommendations for a "gift guide or whatnot, [it would] pass the opportunity to Associate members first."

end of 2001, it had about $4 million in assets against about $2 million in liabilities (mostly deferred revenue). Its 2001 annual income of about $5.3 million came from four sources: membership fees (about $2.8 million, or 52% of total income); "brand management"[4] (about $1.8 million, or 34%), license fees (about $50,000, or less than 0.1%), and conferences/events (about $700,000, or 13%). Expenses of about $4 million were broken down into "brand management" (about $700,000, or 18% of total expenses), "development and core services" (about $500,000, or 13%), sales and marketing (slightly less than $500,000, or 11%), and "general and administrative" expenses (about $2.3 million dollars, or 59%). Net income was thus about $1.3 million.

At the end of 2002, SIG's assets had grown to about $5.6 million, mostly in cash and investments. Liabilities were less than two million dollars, mostly in deferred revenue. Revenues of over $6.7 million were primarily derived from membership fees (about $3 million, or 44%) and product registration fees (about $2.7 million, or 40%). Events brought in almost a million dollars in revenues. Major expenses included events (which cost about $800,000), about $600,000 each for "development and core services" and marketing/promotion, plus around $800,000 for legal fees. The bulk of the remainder was apparently staff salaries (management services and wages/contracts services). Total expenses were almost five million dollars. Net assets increased by about $1.8 million in 2002.

E

In 2002, SIG applied for an exemption under I.R.C. § 501(c)(6), which exempts business leagues from taxation. In 2004, the IRS denied the application, stating:

---

[4]Apparently, this means listing fees.

> Your primary purpose and activity is to promote a single brand of inter-connection technology, rather than the improvement of business conditions of one or more lines of business. In addition, one of your substantial activities consists of providing particular services to individual persons.

SIG responded by paying the assessed tax and penalties for 2000, 2001, and 2002 (about $900,000) and then filing administrative refund requests for those years. After waiting the required time period and receiving no response, it then sued in the Western District of Washington. The complaint sought a refund of income tax, penalties, additions, and interest paid for 2000-2002 under 28 U.S.C. § 1346(a) and I.R.C. § 7422.

The district court granted summary judgment for the United States. SIG timely appeals.

## II

The district court reviewed the Commissioner's decision to deny § 501(c)(6) status de novo. Our review of the district court decision is also de novo, because the existence of a business league is a mixed question of law and fact. *See Eng'rs Club of S.F. v. United States*, 791 F.2d 686, 688-89 (9th Cir. 1986).[5]

---

[5]Our precedent is unclear as to the distinction between fact and law in § 501(c)(6) cases. For instance, in *Engineers Club*, we "assume[d], without deciding, that the district court was not clearly erroneous in determining that the Engineers Club food and beverage service was incidental to the main purpose of the organization." *Eng'rs Club*, 791 F.2d at 689. The government has not argued for a more deferential form of review, and we note that the district court decision in *Engineers Club* was the result of a bench trial. *See Eng'rs Club of S.F. v. United States*, 609 F. Supp. 519 (N.D. Cal. 1985), *overruled by Eng'rs Club*, 791 F.2d at 687. In any case, the result here is the same irrespective of the standard of review. We do not imply that every appellant who challenges a § 501(c)(6) determination is entitled to a fully de novo review.

Section 501(c)(6) of the Internal Revenue Code exempts from income tax

> [b]usiness leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

[1] The operative Treasury regulation, which "merits serious deference," *see National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 484 (1979), states that

> [a] business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. An association engaged in furnishing information to prospective investors, to enable them to make sound investments, is not a business league, since its activities do not further any common business interest, even though all of its income is devoted to the purpose stated.

Treas. Reg. § 1.501(c)(6)-1 (26 C.F.R. § 1.501(c)(6)-1).

**[2]** We have distilled that regulation into a six-factor test:

> Thus, for an organization to achieve business league status, the requirements as stated in Treas. Reg. § 1.501(c)(6) must be met. Section 1.501(c)(6) requires a business league to be an association (1) of persons having a common business interest; (2) whose purpose is to promote the common business interest; (3) not organized for profit; (4) that does not engage in a business ordinarily conducted for profit; (5) whose activities are directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons; (6) of the same general class as a chamber of commerce or a board of trade.

*Eng'rs Club*, 791 F.2d at 689.

**[3]** The district court focused its discussion on factors four and five. We do likewise.

## III

### A

**[4]** We first consider prong four: whether SIG "does not engage in a business ordinarily conducted for profit." Revenue Rulings published by the Internal Revenue Service guide our inquiry. Revenue Rulings are entitled to at least *Skidmore* deference, as they constitute "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Texaco Inc. v. United States*, 528 F.3d 703, 711 (9th Cir. 2008) (quoting *Skidmore v. Swift Co.*, 323 U.S. 134, 140 (1944)).[6]

---

[6]*See also Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 946-48 (9th Cir. 2008) (O'Scannlain, J., specially concurring)

**[5]** Revenue Ruling 58-294 demonstrates an instance in which business league status was denied. The association there "operated for the purpose of promoting uniform business, advertising and fair trade practices in connection with the manufacture and sale of a certain patented product." Rev. Rul. 58-294, 1958-1 C.B. 244. The association indirectly owned the patent, granted licenses thereunder, and sold equipment and materials needed to manufacture the product. The similarities between the association in the Ruling and SIG are substantial. Here, SIG aims to promote uniform practices in connection with a certain patented technology, directly owns the relevant trademark and patent, and grants licenses to its members.

**[6]** Revenue Ruling 70-187 is relied on by both parties. It states that a "nonprofit organization formed by manufacturers of a particular product to conduct a program of testing and certification of the product to establish acceptable standards within the industry as a whole qualifies" as a business league. Rev. Rul. 70-187, 1970-1 C.B. 131. The organization "permits manufacturers to display its 'seal of acceptance' on all product models that have been certified as meeting its standards." *Id.* It "fixes its charges at amounts sufficient to defray only the cost of the program." *Id.* Deciding that the organization's testing and certification program to enforce its product standards was "a self-regulatory measure to prevent trade abuses in the industry," the Ruling concludes that the organization is a business league. *Id.*

**[7]** Although the organization in Revenue Ruling 70-187 and SIG are similar in some ways, there are critical differences. First, the Ruling does not address an "industry" that was created and established by the members themselves.

(asserting that the Revenue Ruling at issue in that case should be entitled to *Chevron* deference, but acknowledging confusion in circuit precedent concerning the deference to be given to informal agency action more generally).

Nothing in the Ruling suggests that the members' very ability to make or to market the product itself was controlled by the organization. (Whether SIG set its charges to cover only certification expenses will be discussed later.).

**[8]** As the district court recognized, the Bluetooth trademark is a "valuable commodity" which is "for sale." Under different circumstances, Ericsson (or the original Promoters) might have licensed its intellectual property for a low price. Companies license their intellectual property rights all the time, and here — where competitors could just as easily come up with a different standard — the owner will likely license its intellectual property at a low enough cost to prevent the formation of rival standards. If Ericsson had decided to license the Bluetooth brand and technology, it would be engaging in business activity of the sort ordinarily engaged in for profit. A low selling price and a manufacturer-agnostic rights holder do not change the fundamental commercial nature of the transaction. *See* Treas. Reg. 1.501(c)(6)-1 ("An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, *even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining*, is not a business league." (emphasis added)). Nothing about the way SIG conducts its business leads to a contrary conclusion.

*American Plywood Ass'n v. United States*, 267 F. Supp. 830 (W.D. Wash. 1967), can be readily distinguished and, in any event, is not controlling authority. In that case, a business league comprised of plywood manufacturers was allowed to test and to certify member plywood in order to promote the acceptance of plywood by the public. As the district court here put it:

> Whereas the plywood association served as a vehicle for advancing a common and pre-existing interest between members, [SIG] was formed to *create* a common interest between its members. Put

another way, the product in *American Plywood* was something the members were already selling to begin with; the product here is something the members banded together to create. Thus, the collective enterprise of [SIG] derives from the fact that it has created a thing of value, which its members can then use to enhance the value of the products they sell.

This is a distinction of consequence under the rationale of *American Plywood*, because of that court's emphasis on "principal" and "incidental" activities. *American Plywood*, 267 F.Supp. at 832-33 ("The rule is well established that a trade association whose main purpose justifies exemption from income tax will not forfeit tax exempt status by engaging in incidental activities which, standing alone, would be subject to taxation"). In delineating principal activities from incidental activities in that case, it was significant that the association's members came together with a common interest in expanding the use of plywood as a building material. While they surely sought to compete with each other over whose plywood was better, they could all agree that selling more plywood was better for everyone, and it was this latter purpose for which the association was principally formed. Thus, while that association's quality control and promotional activities did create a basis for choosing *between* plywood manufacturers, this was "incidental" to the organization's main purpose, which was to broaden the use of plywood in the building materials market. In the present case, [SIG] creates, markets, and sells a thing of value. That it also helps [SIG's] members sell their products does not change this fact.

B

**[9]** Next, we turn to prong five: whether SIG's activities "are directed to the improvement of business conditions of

one or more lines of business as distinguished from the performance of particular services for individual persons." *Eng'rs Club*, 791 F.2d at 689. First, we consider whether SIG's activities benefit at least one "line of business." We must select between dueling concepts of this term of art. One category of possible definitions does not support SIG's position, and the alternative is implausible.

1

**[10]** Most obviously, the "line of business" could be a broad industry such as the wireless communication industry or the consumer electronics industry. However, SIG does not benefit all or nearly all members of any such line of business. It is implausible that most of — or even a substantial amount of — the benefits of SIG's activities fall upon members and non-members alike. SIG claimed that Bluetooth had no "reasonable commercial substitute" while maintaining that non-Bluetooth manufacturers would benefit (in the words of the district court) because consumers "would opt for the unreasonable choice [i.e., a non-Bluetooth product] with greater frequency because of how impressed they are with the Bluetooth brand." As the district court stated, "[b]oth simple logic and [SIG's] dominant market position belie this theory." Rather, it is clear that the business interests of SIG's members are advanced at the expense of other industry members.

**[11]** A review of the case law indicates that a benefit to non-members is a key characteristic of business leagues. For instance, the Seventh Circuit rejected an organization's bid for business league status in *Guide International Corp. v. United States*, 948 F.2d 360 (7th Cir. 1991). Although "Guide's stated purpose [was] to facilitate the use and exchange of information regarding data processing equipment in general, the primary benefit inure[d] to IBM which [was] only a *segment* (70 to 75%) of the mainframe computer business, not a line of business." *Id.* at 362. "[W]hile Guide's members reflect[ed] a wide variety of businesses, no single

business [was] enhanced and Guide only benefits IBM and those individuals within various lines of business who use IBM mainframes." *Id.* Accordingly, the organization was not a business league. *Accord Nat'l Prime Users Group, Inc. v. United States*, 667 F. Supp. 250 (D. Md. 1987) (denying business league status to a similar group); Rev. Rul. 83-164, 1983-2 C.B. 95 (same, despite Rev. Rul. 74-147 finding a business league where users owned computers made by various manufacturers).

Likewise, Revenue Ruling 70-80 stated that a "nonprofit trade association of manufacturers whose principal activity is the promotion of its members' products under the association's registered trademark does not qualify for exemption under section 501(c)(6) of the Code." Rev. Rul. 70-80, 1970-1 C.B. 130. If minimum quality criteria were met, members could sell their products under the trademarked name. "[A] significant number" of manufacturers in the industry were not members. *Id.* Because the trademark was promoted such as to give members a competitive advantage, the trademarking program did not benefit the industry as a whole. *Id.*

**[12]** In contrast, Revenue Ruling 55-444 states that a business league may be "formed to promote the business of a particular industry . . . . by conducting a general advertising campaign to encourage the use of products and services of the industry as a whole . . . . notwithstanding the fact that such advertising to a minor extent constitutes the performance or [sic] particular services for its members." Rev. Rul. 55-444, 1955-2 C.B. 258. The organization's "receipts [were] derived from assessments on members and from contributions from the national industry association." *Id.* "[S]ome of the newspaper and radio advertisements urged consumers to buy from an organization member." *Id.* Despite the pro-member slant of some advertisements, the Service found the organization to be a business league: "[m]ost of the benefits to members of the organization were indirect and accrued alike to members and other persons in the industry" and the advertising favoring

association members was only "a minor portion of total advertising expenditures." *Id.*

**[13]** SIG's advertising campaign is not "general" or intended to promote "the use of products and services of the industry as a whole." It benefits members directly and predominately by giving them a competitive advantage over non-members. Although consumers using Bluetooth products may benefit, that is not enough. SIG is more like the organizations in Revenue Ruling 70-80 and *Guide* than the organization in Revenue Ruling 55-444.

2

We cannot accept the idea that "Bluetooth-enabled products" constitute an industry. No one can manufacture Bluetooth products (at least in any meaningful way) without joining and contributing money to SIG. Accordingly, membership in the proposed line of business would be necessarily limited to members of SIG. SIG has not identified any line of business that has such a requirement. Nor has SIG pointed to any industry where the industry organization created the industry itself. The "Bluetooth industry" is inextricable from SIG itself, which controls the rights to the technology and trademark. To quote the district court, the industry must be "what members did aside from the particular organization . . . not what they developed as a result of their membership."

Furthermore, while Bluetooth may be the best available technical solution for certain wireless applications, it is hardly the only game in town. Other protocols have their advantages and disadvantages. While Bluetooth is predominant in its home market of cellular headsets and handsets, its superiority in other markets is less clear. For instance, SIG discusses other technologies on its website, often emphasizing their shortcomings in relation to Bluetooth. If Bluetooth were truly the only viable specification, SIG would not need to trumpet its superiority over other options.

3

SIG relies heavily on the district court decision in *American Plywood*. The American Plywood Association (the "APA") was granted business league status from 1936 to 1960. *Am. Plywood*, 267 F. Supp. at 831. The district court noted that the APA's work in promoting the plywood industry and public acceptance thereof was "largely . . . responsible" for the massive increase in plywood sales over that period. *Id.* After the APA passed a bylaw which increased "its membership dues 'to be devoted to the promotion of . . . plywood [with the APA's seal of approval] primarily through the medium of television,'" the Commissioner revoked its § 501(c)(6) status, and the APA sued for a refund of taxes paid thereafter. *Id.*

The court noted that the APA's promotional and quality control activities must be viewed in the context of the APA's "inter-related activities as they have developed in the past thirty years," activities which had been carried out "to the great benefit of all softwood plywood manufacturers, whether members of plaintiff association or not." *Id.* at 832-33. The government countered that, once the bylaw passed, the "quality control and promotional activities . . . became more than incidental to plaintiff's main purpose and activities." *Id.* at 833. The court noted that no profits accrued from the quality control activities, that the APA's income was "derived solely from membership dues," and that "there [was] no possibility that dues may be reduced because of profits." *Id.* at 834. The court held that the quality control services were not more than incidental and were consistent with the organization's long history of promoting quality in other ways. *Id.*[7] The benefits derived from the APA's quality control were "inherently and most immediately group benefits in that quality control

---

[7]For instance, the APA had lobbied government agencies to allow only the use of plywood meeting certain commercial standards. *Id.* at 835.

insures [sic] safe plywood, a prerequisite to its acceptance by the public." *Id.* at 835.

SIG is dissimilar to the APA in many important ways. Chief among them is that, as discussed above, Bluetooth-compatible products do not constitute an industry. We have no difficulty in treating plywood as a line of business apart from the larger building products industry (e.g., drywall). Plywood is made of a specific material by a specific process. In contrast, Bluetooth-compatible products stand in relation to non-Bluetooth-compatible products more as IBM mainframes stood in comparison to other mainframes in *Guide*.

**[14]** Other differences run in favor of the government as well: all funding for the APA inspection came from general dues, and the trademark program could not turn a profit or lead to reduced dues. *Id.* at 834. With SIG, in contrast, funding comes from specific licensing fees, and such funding could be keeping membership dues down. The district court found that the APA's operation benefitted non-members, *id.* at 832-33; the district court here quite properly determined that SIG's certification and the advertising based on it do not. Finally, *American Plywood* places great weight on the trademark activity in the context of the APA's tireless thirty-year history of successfully promoting plywood of all kinds.[8] *See id.* at 832. In this case, there is no such history to fall back upon. SIG advertises Bluetooth and only Bluetooth, and in no way seeks to promote products which lack the Bluetooth trademark. Indeed, the key point of the Bluetooth advertising message is that consumers should ensure their devices will work together by selecting those products whose manufacturers have paid SIG for permission to brand their products with the Bluetooth logo.

---

[8]Of course, we are not bound by *American Plywood,* but we do not think its holding can be divorced from the APA's history and broad scope of activity which benefitted member and non-member alike.

## C

**[15]** Continuing our analysis of prong five, we also conclude that SIG engages in particular services for particular member-manufacturers. We recognize that the promotion of products under an organization's registered trademark is not necessarily inconsistent with business of a non-profit flavor. *Am. Plywood,* 267 F. Supp. at 832-33. Nor do we deny that an industry organization may create a 'seal of approval' for products meeting trade standards to combat abuse in the industry. Here, however, there is no industry, only an organization promoting one of a number of possible technologies for the interest of its members as opposed to an industry writ large.

SIG is similar to the alleged business league in *MIB, Inc. v. Commissioner*, 734 F.2d 71 (1st Cir. 1984). MIB was (and still is) a clearinghouse for life insurance companies. *See id.* at 73. It helps member companies determine whether an applicant is hiding any medical limitations, participation in aviation, and the like. *See id.* About half of MIB's revenue came from fees charged for each applicant's name that was submitted to an insurance company. The other half came from assessments on member companies based on the amount of insurance in force. *See id.* at 74. The court concluded that MIB provided particular services for individual persons. *See id.* at 77. "The ultimate inquiry," said the court, "is whether the association's activities advance the members' interests generally, by virtue of their membership in the industry, or whether they assist members in the pursuit of their individual businesses." *Id.* at 78.[9] It was not enough that "members of a particular industry or trade have banded together to provide a service which all of them need," even if that activity is "to-

---

[9]But: " '[I]t can hardly be supposed that individuals would often join organizations without the expectation of receiving some personal benefits therefrom.' " *MIB, Inc.*, 734 F.2d at 78 (quoting *Nat'l Leather & Shoe Finders Ass'n v. Comm'r*, 9 T.C. 121, 126 (1947)).

tally commendable" and serves the public interest. *Id.* at 77; *see also Guide*, 948 F.2d at 362 (acknowledging that the organization benefitted members of the public who used IBM mainframes).

**[16]** "[A] major factor in determining whether services are 'particular' is whether they are supported by fees and assessments in 'approximate proportion to the benefits received.' " *MIB, Inc.,* 734 F.2d at 79. Here, about half of the revenue came from per-use charges. Although the remainder of the funding came from dues based on size and sales volume — a traditional business league revenue source — that funding was not unrelated to the number of requests and were in any event not enough to "defeat the inference of particular services created by the service charges." *Id.* Accordingly, the business league exemption was denied.

**[17]** Even though the Bluetooth certification fees are not as proportional to the benefit received as were the fees in *MIB, Inc.*, there still exists an obvious quid pro quo: in each transaction, the ability to use the Bluetooth trademark on one product is exchanged for several thousand dollars. *Cf. Am. Plywood*, 267 F. Supp. at 834 (certification costs were covered by member dues, not special fees). As with *MIB, Inc.*, there is no reason that the presence of membership dues (here based, albeit roughly, on manufacturer size) overrides that perception. And although some of SIG's activities promote Bluetooth generally, the certification program primarily aids members in the pursuit of their businesses. That is, after all, why members pay the listing fees. Like the *MIB, Inc.* court, we mean to cast no aspersions on SIG or the public benefit that accrues from collaboration in the wireless industry. Yet, a finding of group and public benefit does not necessarily make an organization a business league. *See MIB*, *Inc.,* 734 F.2d at 80.

## D

**[18]** Finally, we consider whether the particular services SIG performs for its members are incidental. Incidental activi-

ties which fall outside of the definition of a business league will not bar an organization from receiving non-profit status. *See Am. Plywood*, 267 F. Supp. at 832 ("The rule is well established that a trade association whose main purpose justifies exemption from income tax will not forfeit tax exempt status by engaging in incidental activities which, standing alone, would be subject to taxation."). However, we conclude that the services at issue here are not incidental. Unlike in *American Plywood*, there is no long-standing overarching program of SIG promoting the wireless industry — or any other industry — as a whole. It would be as if the only activities of the American Plywood Association were certification, development of its standard, and promotion of the same. Everything that SIG does supports, in one way or another, the Bluetooth brand which is the organization's central asset and focus.

We may consider "the fact that . . . . a large percentage of [an organization's] income was derived from activities for the benefit of individuals is a strong indication that these activities were more than merely incidental." *Ind. Retail Hardware Ass'n, Inc. v. United States*, 366 F.2d 998, 1002 (Ct. Cl. 1966).[10] *Indiana Retail* also relied on the amount of staff time consumed by the supposedly incidental function. *Id.*[11]

SIG is stuck between a rock and a hard place: if it is making a profit off of qualifications, it is clearly distinct from the

---

[10]In *Indiana Retail*, the supposedly incidental activities were the source of almost 60% of the organization's revenue. *Id.* at 1002. *Accord Associated Master Barbers & Beauticians of Am., Inc. v. Comm'r*, 69 T.C. 53, 68-69 (1977) (relying on receipts and expenses averaging about thirty percent to find that sickness and disability insurance program for members was not incidental).

[11]*See also, e.g.*, *Evanston-North Shore Bd. of Realtors v. United States*, 320 F.2d 375, 380-81 (Ct. Cl. 1963) (considering the costs, as well as the revenues, attributable to the supposed incidental activity); *Associated Master Barbers*, 69 T.C. at 68 (considering disbursements from insurance program).

organizations in Revenue Rulings and cases which did not charge more than was necessary for the costs of administering the certification program. *See, e.g.,* Rev. Rul. 70-184. If it spent as much on certification as it brought in, then a quite substantial part of the organization's efforts are tied up in certification, proving that the activity is not merely incidental. Either way, SIG's certification program is inconsistent with business league status.

Furthermore, SIG's advertising promotes only its members' interests, in contrast with the situation in *American Plywood*. There, "[a]ssuming advertising use of the plywood association grade trademarks tends to negative plaintiff's qualification for tax exempt status," the court wrote, "the 'incidental' exception is applicable." *Am. Plywood,* 267 F. Supp. at 835. "The main purpose" of the advertising was to promote plywood. *Id.* at 836. "[T]he reference to trademarks in [the APA's] advertising [was] of minor importance": the "grade trademark [was] shown as a symbol of quality plywood and [was] presented without special emphasis or embellishment." *Id.* Almost always, the trademark was used "in an incidental manner and in subordinate position." *Id.* No specific producer of the trademarked wood was ever mentioned. *Id.* "It can reasonably be inferred from the evidence that use of trademarks in plaintiff's advertising produce[d], at least indirectly, benefits for the few plywood manufacturers who are not members of [the] association."[12] *Id.* at 835. Accordingly, the promotional activities did not preclude classification as a business league.

**[19]** The overwhelming purpose of SIG's promotional activities was to promote the Bluetooth brand. Far from being of minor importance, the Bluetooth trademark was the focus of SIG's advertising campaign. Specific producers are sometimes named. Any benefit on the wireless communication industry or non-Bluetooth manufacturers was, in fact, merely

---

[12]We might not necessarily endorse this particular factual finding, but the record in the *American Plywood* case is not before us.

incidental. SIG's advertising was neither an incidental part of its operations nor only incidentally biased in favor of its members as opposed to others in the industry. It cannot avail itself of the incidental activities exception.

## IV

[20] We agree with the district court that SIG engages in a business of the sort ordinarily engaged in for profit. We also agree that it provides non-incidental services for particular members. Accordingly, the district court properly held that SIG is not entitled to exemption from taxation under I.R.C. § 501(c)(6) in granting summary judgment to the United States.

**AFFIRMED.**